ANTHONY M. BRADY *v.* WILLIAM J. OLIVER,

and

WILLIAM J. OLIVER *v.* ANTHONY M. BRADY.

(*Nashville.*    December  Term,  1911.)

1. **CONTRACTS.  Announced intention not to perform  may be treated as a breach; suit at once.**

 Where one party to a contract announces in advance his intention not to perform it, the other party thereto may treat the contract as broken, and sue at once for the breach. without waiting for the time fixed for performance.  (*Post, pp.* 611, 612, 615.)

 Cases cited and approved:  Roehm v. Horst, 178 U. S., 1; O'Neill v. Supreme Council, 70 N. J. Law, 410; Hochster v. De La Tour, 2 El. & Bl., 678.

2. **SAME.  Same.  Breach by voluntarily rendering performance a legal impossibility; suit at once, when.**

 Where one party to a contract voluntarily disables himself from performing his part of the contract, by voluntarily making performance, on his part, a legal impossibility because of his assumption of other obligations or relations wholly inconsistent with the performance, or by preventing the performance through his unauthorized act, the other party may sue at once for the breach, in the absence of any stipulation in the contract to the contrary.  (*Post, pp.* 612-614.)

 Cases cited and approved:  Mining Co. v. Humble, 153 U. S., 540; Wolf v. Marsh, 54 Cal., 228; Shaffner v. Killian, 7 Ill App., 620; Insurance Co. v. Insurance Co., 157 N. Y., 633; Stark v. Duval, 7 Okl., 213; Lumber Co. v. Logging Co., 120 Ala., 558; Lockport v. Shields, 87 Ill. App., 150; O'Neill v. Supreme Council, 1 Ann. Cas., 422, and note, and citations.

3. **SAME.** Right of rescission for default of other party in abandoning contract; no such intention in this case.

Before one party to a contract can rescind it for the default of the other party, the default must be of such character as indicates an intention upon the part of the defaulter to abandon the contract. In this case, there was no intention to abandon the contract or property. (*Post, pp.* 614, 615.)

Cases cited and approved: Freeth v. Burr, L. R., 9 C. P., 208: Railroad v. Richards, 152 Ill., 59, 30 L. R. A., 33, and note.

4. **SAME.** What disability or inability will justify the other party in abandoning the contract.

The disability arising from one's disabling of himself to perform the contract within the time limit need not necessarily be such as prevents the discharge of every obligation of the contract; but the inability to perform the contract in respect to matters which would render the performance of the rest of a thing different in substance from the thing contracted to be done will justify the party not in default in abandoning the contract. (*Post, pp.* 615, 616.)

5. **SAME.** Time is not the essence of working contracts; damages for delay is only remedy.

As a general rule, time is not of the essence of working contracts, and where the contractor fails to perform his work within the specified time, he is liable in damages only for the delay. (*Post, p.* 616.)

6. **SAME.** Same. Failure to complete work within time does not terminate contract; injured party may terminate it after time expires.

Where time is not the essence of a working contract, the failure of the contractor to complete the work within the time specified does not, of itself, terminate the contract; but it may be terminated after the expiration of the time, at the election of the injured party. (*Post, p.* 616.)

Brady v. Oliver.

7. **SAME.  No rescission of building contract in anticipation of nonperformance within time, when.**

Where a building contractor was actively engaged in the performance of the work with a large equipment of men, machines, animals, and things, under a contract which made time the essence of the contract, and a material part of it, but was unable to complete the work within the time specified in the contract, though he would be able to perform it by an extension of the time limit, and there was no defalcation in the grade and quality of the work performed, the owner was not justified, at a remote period from the time limit, in rescinding or annulling the contract, in anticipation of a failure of the contractor to complete the work within the time specified. (*Post, pp.* 615-617.)

8. **SAME.  Rescission for other party's total or legal disability, actual default, or unequivocal renunciation, when.**

To justify a rescission or. annulment of a contract by one party, there must be, upon the part of the other party, an actual default, unequivocal renunciation, or total or legal disability to perform it, and such disability cannot be anticipated; but after it occurs, the nonperformance may be anticipated; yet the disability must be so complete as to place it beyond the power of the defaulting party to perform his obligations in every material respect, so that the thing that could be accomplished would be essentially different from that contracted and promised. The disability must exist at the time of the renunciation as a legally accomplished fact, and not as a mere potentiality. (*Post, pp.* 617, 618.)

9. **SAME.  Forfeiture clause will not be enforced against contractor upon owner's wrongful rescission of building contract, when.**

The provision in a building contract that the work should be begun before a designated date and prosecuted with proper speed, so as to complete the work before a designated future date, and that, on the refusal of the contractor to supply a sufficiency of materials and workmen to insure completion

within the time specified, the owner might provide, at the
contractor's expense, materials and workmen to proceed with
and finish the work, and that, in case of a default of the
contractor to proceed promptly and complete the work, the
owner might cancel the contract and relet the work, or other-
wise prosecute it, and, in case of such annulment, all
moneys due the contractor should be forfeited to the owner
without releasing the contractor from liability, will be given
their proper force and effect; but the forfeiture clause inflict-
ing severe and drastic penalties for nonperformance will be
strictly construed against the owner, and the contractor's mere
delay in the progress of the work will not justify the owner's
rescission or annulment of the contract so as to visit upon the
contractor a forfeiture of compensation and damages for such
annulment. (*Post, pp.* 617-620.)

10. **SAME. Termination, without right, is a breach.**

Where the owner, without the right to do so, terminates a
building contract during the progress of the work, it neces-
sarily follows that he thereby breaches it. (*Post, pp.* 610, 611,
620.)

11. **SAME. Legal right to abandon or renounce contract, sub-
mitting to legal consequences.**

Either party to a contract has the legal right to abandon or re-
nounce it at his will, submitting to the legal consequences
thereof. (*Post, pp.* 620, 621.)

Case cited and approved:  Ault v. Dustin, 100 Tenn., 383.

12. **SAME. Measure of damages for breach is compensation, when.**

The measure of damages for the breach of a contract, by its
nonperformance, is actual compensation in all instances where
the nature of the case admits of the rule. (*Post, p.* 621.)

Case cited and approved:  Railroad v. Guinan, 11 Lea, 103.

13. **SAME. Same. Value of breached contract is difference be-
tween price and value.**

Generally the value of a contract breached by its nonperform-
ance is the difference between the price agreed to be paid for

Brady v. Oliver.

its performance and the cost of performance to the other party. (*Post, pp.* 621, 623.)

Case cited and approved:   Singleton v. Wilson, 85 Tenn., 344.

14. **SAME. Same. Same. Measure of damages for contractor's breach of a building contract is the difference between agreed price and cost of performance.**

Where the contractor abandons a building contract, he must compensate the owner for the damages sustained, which is the difference between the agreed price and the cost of performance.   (*Post, p.* 621.)

15. **SAME. Remedies of contractor for owner's termination or rescission of a building contract.**

Where the owner, having employed a contractor to perform specific work, wrongfully orders him to vacate the premises and to desist in the further performance of the contract; the contractor may treat the contract as rescinded, and recover damages upon a *quantum meruit,* so far as he has performed it; or he may keep the contract alive for the benefit of both parties, being himself at all times ready and able to perform the contract, and, at the end of the time specified in the contract for performance, sue and recover under the contract; or he may treat the repudiation as terminating the contract for all purposes of performance, and sue for the profits which he would have realized if he had not been prevented from performing it. (*Post, pp.* 621, 622.)

Cases cited and approved:   Wright v. Haskell, 45 Me., 489; Miller v. Thompson, 22 Ark., 258; Railroad v. Richards, 152 Ill., 59.

16. **SAME. Rescission entitles injured party to restoration of status quo; repudiator cannot claim benefit.**

As a general proposition, neither party to a contract can rescind it without restoring the *status quo;* and one cannot repudiate the contract, and refuse to perform his part of it, and at the same time claim the benefit he has derived from it; and in a

court of equity, in all matters of rescission, and in all relief akin to rescission, the parties will invariably be placed in *statu quo*. (*Post, p* 622.)

Cases cited and approved: Hill v. Harriman, 95 Tenn., 305 (and citations); Curtis v. Brannon, 98 Tenn., 161.

17. **SAME. Same. Owner's wrongful termination of building con-.tract treated as a rescission by the contractor entitles contractor to recovery for expenditures in performance, when.**

Where the owner, having employed a contractor to construct a power house, lock and dam, and core wall, wrongfully ordered the contractor to vacate the premises and to cease further work, at a time when he was, in good faith, actively engaged in the due and proper performance, with a large equipment of men, machines, animals, and things, the contractor can recover compensation for the outlay of labor and money expended on the property and the necessary expenditures in preparing for performing the contract, upon merely showing that, in good faith, he was in the due performance of his part, without showing that he could have performed the contract within the time specified. Such suit is not upon the contract, nor for the value of the contract, nor for profits, nor for damages for its breach, but for the outlay of labor and money and expenditures of the contractor in his effort to perform it prior to its rescission by the owner's wrongful termination thereof, which the contractor treated as a rescission. (*Post, pp.* 622-625.)

Cases cited and approved: United States v. Behan, 110 U. S., 338: Cederberger v. Robison, 100 Cal., 93; Manufacturing Co. v. Manufacturing Co. (C. C.), 39 Fed., 440; McElwee v. B. L. & I. Co., 4 C. C. A., 525, 54 Fed., 627; Griffith v. Blackwater, B. & L. Co., 55 W. Va., 604; Worthington v. Gwin, 119 Ala., 44.

18. **SAME. Brief statement of expenditures testified to, in the absence of opposing testimony, is not too vague and indefinite for recovery, when.**

Brady v. Oliver.

Upon the issue of what were a contractor's expenditures in his effort of performance which he was entitled to recover from the owner, upon the owner's wrongful termination and breach of a construction contract, which was treated by. the contractor as a rescission, a statement compiled by the contractor's book-keeper from his books, giving unitemized .amounts for plant, materials, supplies, and labor, and for "other expenses not included in above," stating amount of such other expenses testi-fied to by him, while very brief, is not too vague and indefinite to support a finding of the facts so testified to by him, there being no opposing evidence. (*Post, pp.* 625, 626.)

19. SAME. Interest on damages from institution of suit for owner's wrongful termination of construction contract, treated as a rescission by the contractor.

Where a contractor, unlawfully prevented from completing the performance of the work by the owner's wrongful termination of the construction contract, treated by the contractor as a rescission, sued the owner for his outlay of labor, money, and expenditures in his preparation for performance and in the performance until stopped by the owner's such wrongful act, he was entitled to recover the same as damages, together with interest from the institution of suit therefor, but not from the date of said wrongful termination of the contract. (*Post, p.* 626.)

---

FROM MARION.

---

Appeal from the Chancery Court of Marion County.— T. M. McCONNELL, Chancellor.

LANCASTER & WILLIAMS, SPEARS & LYNCH, and COLE-MAN & FRIERSON, for Brady.

LINDSAY, YOUNG & SMITH, T. A. WRIGHT, and PRITCH-
ARD & SIZER, for Oliver.

MR. JUSTICE LANSDEN delivered the opinion of the
Court.

This is a bill and a cross bill. The main purpose of
the original bill is to recover damages against the de-
fendant, Oliver, for the alleged breach of a building con-
tract entered into between the parties, by the terms of
which Oliver contracted to construct a power house,
a lock and dam, and a core wall extending from the
power house on the east bank of the Tennessee river back
to the face of the mountain at Hale's bar. The com-
plainant alleges his damages to amount to $1,750,000.
The defendant filed his answer as a cross bill, by which
he sought to recover from Brady, for an alleged breach
upon the part of Brady of the same contract, the sum
of $800,000. The chancellor decreed in favor of Oliver
in the sum of $430,529.58. From this decree, Brady
prayed a broad appeal, and has assigned errors. Oliver
has filed the record for a writ of error, and has assigned
two errors thereon.

The main work provided for by the contract consisted
of the foundations for a power house, 180 feet long and
sixty feet wide on the east bank of the Tennessee river,
and extending out into the river; a lock on the west
bank of the river, with one concrete wall 630 feet long
against the bank, and another 550 feet long, leaving a

space of sixty feet between, the walls, the walls to be thirty feet thick at the bottom, and twenty-five feet at the top, and twenty-five or twenty-six feet high; a concrete dam 1200 feet across the river, and connecting the power house and lock; and a concrete core wall on the land, extending from the power house back to the face of the mountain, a distance of 785 feet.

The original contract was signed between the parties October 19, 1905. It required that the power house work be completed by February 19, 1907, and the entire work by October 19, 1907. Sections 6, 7, and 8 of the original contract are as follows:

"6. It is also agreed that work under this contract shall be begun before October 26, 1905, and shall be prosecuted with such speed, and at such number of points, and with such machinery and force of men, animals and appliances and things as will insure the full completion of all work embraced in this contract not later than the 19th day of October, 1907, and that all the work shall be completed on or before that day.

"The various works are to be begun and prosecuted at such points and at such different portions of the works as shall be directed and approved by the engineer, who shall have power to prescribe the order and approve the manner of executing the same.

"7. Should, at any time during the progress of said work, the said contractor refuse or neglect to supply a sufficiency of materials or workmen to insure, in the opinion of the engineer, its completion within the time specified, or should he suspend work (except through

a stress of weather), on any working day, the said princi-
pal shall have the power and is hereby authorized, on
giving three days' written notice, to provide, at the ex
pense of the contractor, materials and workmen to pro-
ceed with and finish the said work (and such expense
shall be deducted from the amount retained under this
contract by the said principal), and if the amount re-
tained be sufficient to pay such expense, said contractor
shall remain liable for any deficiency: Provided, how-
ever, that should the said contractor be obstructed or
delayed in the prosecution or completion of his work
by the act, neglect, delay, or default of the principal,
or of the said engineer, or by the abandonment of the
work by the employees (commonly known as a strike or
strikes) of the contractor, through no fault of the con-
tractor, then the time herein fixed for the completion
of the said work shall be extended for a period equiva-
lent to the time so lost by reason of any or all of the
causes specified; but no such allowance shall be made
unless claim therefor be presented in writing to the said
engineer within twenty-four hours of the commencement
of such delay or delays. The duration of such extension
or extensions shall be certified to by the engineer, but
appeal from his decision may be made to arbitration in
the manner as herein provided.

"8. And it is also furthermore agreed between the par-
ties hereto that, in case of a default on the part of the
contractor to promptly and properly proceed with and
complete the work, said principal reserves the right and
option to annul and cancel this agreement and to relet

the work, or any part thereof, or otherwise prosecute it, and said contractor shall not be entitled to any claim for damages on account of such annulment, nor shall such annulment affect the right of said principal to recover damages which may arise from such failure on the part of said contractor to fulfill the terms of this agreement. And in case of such annulment all moneys due said contractor, or retained under the terms of this agreement, shall be forfeited to said principal; but such forfeiture shall, however, not release such contractor from the fulfillment of this contract, but he and his sureties shall compensate the principal for any and all loss and damage which may result from such default. Said contractor shall be credited with the amount of the moneys so forfeited toward any greater sum that he may become liable for to said principal on account of the default of said contractor."

The defendant, Oliver, entered upon the performance of this contract soon after its execution. In a short time thereafter controversies arose between the parties concerning a number of material matters, and especially the contention of Oliver that the conditions under which the work was to be done were materially misrepresented in the drawings and specifications, which were made a part of the contract. This controversy was waged for some time, during which progress upon the work seems to have been slow and unsatisfactory to Brady. On the 30th of April, 1907, the parties entered into a supplemental contract, by the terms of which all of the preceding disputes were settled, or a basis of settlement

was agreed upon, and further time was given Oliver in which to complete the work. This contract provided as follows: .

"It has been and is hereby mutually agreed between the said principal and the said contractor:

"(1) That the claim for compensation for work and material in the slopes, and in excavating for the core wall, and for damages claimed as the result of alleged delay of work in the excavation of said core wall, alleged to be caused by the engineer of said Brady, which is asserted by the contractor to be additional work and damages for which he is entitled to extra compensation, be referred to Engineer Bogart for decision, with the privilege reserved to either party to have arbitration, if demanded and as in the contract provided, after his decision.

"(2) It is further agreed that the engineer shall divide the cofferdam into four or more sections, and shall apportion to each section its due proportion of the contract price, and give to the contractor separate estimates on each section. The first estimate of any section shall be due when the section is completed and the excavation made as designated by the contract, and other estimates when and as prescribed in the contract.

"(3) That a superintendent fully competent and experienced in the class of work covered by the contract shall be forthwith placed and at all times kept in full charge thereof by said contractor at his expense, and who shall be selected by the said contractor with and after the approval of the said Engineer Bogart. Said

superintendent shall have full authority from said contractor to push the said contract to completion, the time for which is hereby extended for twenty months from the date hereof; and it is agreed that this agreement is not to take effect and be binding until said superintendent has been agreed upon and employed in accordance with the provisions of this section.

"Said contractor is to furnish and employ all available help, animals, equipment and machinery, and supplies and all things, which will as directed by and in the opinion of Engineer Bogart be necessary to obtain said completion within such time, and shall at all times supply and keep supplied the funds necessary for all such requirements.

"(4)   That the power house shall at once be progressed, and the work and material necessary to its completion at once be furnished, and that the same shall be fully completed within one year from the date hereof, and that the provision in this contract for longer time shall not apply to such power house construction."

After the execution of the supplemental contract, Mr. Bogart, the engineer of Mr. Brady, recommended a superintendent of the work to Mr. Oliver, who took charge and continued until, it seems, he voluntarily withdrew.   Oliver selected his successor, and referred this appointment to Bogart, who approved it.   The work continued until December 6, 1907, and on that day the complainant, Brady, served notice upon Oliver, which, after reciting the contracts above referred to, stated:

"Because of your default to promptly proceed with and complete the work, I hereby, as provided in paragraph 8 of said original contract, avail myself of the option to, and do hereby, annul and cancel the said contracts between us for said work, and hereby notify you that said contracts are annulled and canceled, and that I will, as promptly as I am able to do so, relet the work or otherwise prosecute it, as I may deem best, holding you and your bondsmen . . . liable for all damages I may sustain by reason of your aforesaid breach of said contracts.

"You are further notified to remove from the premises, within twenty days from this date, your plant and equipment, in order that I may not be delayed in putting on my own forces and equipment for the prompt prosecution of the work.        "Yours very truly,

"ANTHONY N. BRADY,

"By ANDREW HAMILTON, His Attorney."

And upon the same day, he received the following letter from Bogart:

"Chattanooga, Tennessee, December 6, 1907.

"Mr. William J. Oliver, Knoxville, Tennessee.

"Dear Sir: Mr. A. N. Brady having notified you that he has annulled and canceled the contracts for the lock and dam, etc., between himself and you, I beg to say that if you care to make any proposition to turn over the equipment which you now have on the grounds, and in connection therewith, I shall be pleased to present the same to Mr. Brady, and consult with you both regarding the same. If you do not care to make such a propo-

sition, or if no such negotiations are agreeable to you, and none are brought to a conclusion within the next five days for a transfer by you of your said equipment and adjustment of all matters, in my judgment twenty days will be ample time within which to remove all your equipment on the premises, which are subject to the uses of Mr. Brady and his principals, so that a clear field will be open for installing an equipment and the forces necessary to speedily complete the work.

"I am now in Chattanooga, and if you promptly advise me, by wire or otherwise, I will remain for a few days to receive any proposition you may make looking towards such an adjustment.          Yours very truly,

"JOHN BOGART.

"Address Read House."

The contract stipulated that Oliver should do all work preparatory to its performance at his own expense. In pursuance of this stipulation he had expended large sums in building concrete mixers, houses for laborers, a railroad, and divers and sundry things necessary to the performance of the work. After the notice to remove his equipment from the premises within twenty days, the parties agreed to refer the matter in controversy to arbitration, and before the arbitration should be made upon the other matters in dispute it was agreed that the value of Oliver's plant, equipment, tools, supplies, etc., should be determined, and that Brady should have the option for thirty days to purchase the plant and equipment at the appraised valuation, and, if Brady did not

125 Tenn.—39

exercise this option, the arbitration agreement was to be of no effect. The arbitrators were selected, one by each of the parties, and these two selected a third. A majority of the arbitrators reported that the value of the plant equipment, supplies, etc., belonging to Oliver and upon the premises, was $250,729.79. Brady declined to avail himself of the option to purchase the plant at the price fixed by the arbitrators, and the arbitration came to an end. Two days later the original bill in this case was filed, seeking to recover damages for the alleged breach of contract, as well as possession of the premises on which the lock and the dam were being built, and to remove the plant and equipment belonging to defendant therefrom. Upon this bill the chancellor made an order directing the defendant to commence to remove his entire plant from the premises within about seven days from the date of the order. The impracticability of removing the equipment placed upon the premises by the defendant within the time designated in the order of the chancellor, as well as the twenty days designated in the notice of the complainant, being quite apparent, the parties came to an agreement as to the value of the equipment, and Oliver sold to the complainant, Brady, for the use of the parties to whom he had relet the work. The price agreed upon was $130,000.

It should be observed that at the date the complainant assumed to annul the contract, December 6, 1907, the time for performance of its provisions by defendant had not expired. He was allowed twelve months from April 30, 1907, in which to do the power house work, and

twenty months in which to complete the other work.
Nothing else appearing, *prima facie* the complainant,
Brady, breached the contract when he terminated it
and ordered the defendant to vacate the premises.  The
theory of the complainant, which, it is claimed, justified
him in terminating the contract, and which entitles him
to recover of the defendant the damages claimed for
its breach by him, is that the work was in such con-
dition on the day that it was terminated that it had
become impossible for the defendant to complete the
power house within the time limit, April 30, 1908, and
the entire work by December 30, 1908, as required by
the contract; second, that it would have cost the defend-
ant largely more to perform the contract than the total
price at which he had contracted to do the entire work,
and therefore the annulment of the contract by the com-
plainant, even if wrongful, resulted in no damage to
the defendant.

Many cases can be found which support the doctrine
that, where one party to a contract announces in ad-
vance his intention not to perform, the other party may
treat the contract as broken, and sue at once for the
breach, without waiting the arrival of the time fixed
by the contract for performance.  *O'Neill* v. *Supreme
Council,* 70 N. J. Law, 410, 57 Atl., 463, 1 Ann. Cas.,
422; *Hochster* v. *De La Tour,* 2 El. & Bl., 678, 75 E. C.
L., 678; *Hochster* v. *De La Tour* is often cited by Ameri-
can courts as a leading authority to sustain this doc-
trine, and in that case Mr. Justice Crompton said:

"When a party announces his intention not to fulfill the contract, the other side may take him at his word and rescind the contract. That word 'rescind' implies that both parties have agreed that the contract shall be at an end as if it had never been. But I am inclined to think that the party may also say: 'Since you have announced that you will not go on with the contract, I will consent that it shall be at an end from this time (meaning, of course, for purposes of further performance) ; but I will hold you liable for the damage I have sustained; and I will proceed to make that damage as little as possible by making the best use I can of my liberty.' This is the principle of those cases in which there has been a discussion as to the measure of damages to which a servant is entitled on a wrongful dismissal."

The same rule has been announced by the supreme court of the United States in *Roehm* v. *Horst,* 178 U. S., 1, 20 Sup. Ct., 780, 44 L. Ed., 953, and many authorities there cited; 7 Am. & Eng. Ency. of Law, 150.

It is equally well settled that, if one party to a contract voluntarily disables himself from performing his part of the contract, the other party has an immediate right of action for the breach. *Wolf* v. *Marsh,* 54 Cal., 228; *Shaffner* v. *Killian,* 7 Ill. App., 620; *Union Insurance Co.* v. *Central Ins. Co.,* 157 N. Y., 633, 52 N. E., 671, 44 L. R. A., 227; *Stark* v. *Duval,* 7 Okl, 213, 54 Pac., 453. The common case of a party disabling himself from the performance of his part of the contract which confers upon the other party an immediate right of

action is where the disability is total and goes to the whole contract. In such case there is but little difficulty in determining the rights of the parties, as, if a man who has promised to marry a woman on a certain day marries another woman before that day, the impossibility of the performance of the contract between them is indisputably established by the fact of his marriage; or where one, who has contracted to execute a lease on a future day for a certain term, before that day executes a lease to another for the same term. In cases of this character, the performance of the contract is made a legal impossibility by the assumption upon the part of the defaulting party of obligations with respect to the subject-matter of the contract that are wholly inconsistent with the performance.

A third case, in which a breach of the contract may be anticipated by the injured party, is where the other party by his unauthorized act prevents performance. *Anville Mining Co.* v. *Humble,* 153 U. S., 540, 14 Sup. Ct.. 876, 38 L. Ed., 814; *Wagner Lumber Co.* v. *Sutherland Logging Co.,* 120 Ala., 558, 24 South., 949; *Lockport* v. *Shields,* 87 Ill. App., 150. And see authorities cited in the note to *O'Neill* v. *Supreme Council,* supra.

Aside from any stipulation in the contract of the parties respecting the right of rescission for an anticipatory breach of the contract, we are not aware of any instances which authorize a rescission in anticipation of a breach other than those that may be ranged within the principles of the cases set out above. The insistence here is that the defendant, Oliver, had disabled himself

from performing his part of the contract. By this it is evidently meant that he had disabled himself from performing his part of the contract within the stipulated time. As we understand the record, there is no contention that he had disabled himself from doing the work of the grade and character, as well as quantity and quality, stipulated by the contract, if there were sufficient extensions of the time limit. But it is claimed that, although the defendant had performed a substantial part of the work contracted for and was actively engaged in the further performance of his obligations under the contract, nevertheless the complainant was of opinion on December 6, 1907, that the defendant did not have sufficient time left within the contract limit to complete the work, and that this deficiency in time limit arose out of the defendant's lack of diligence in prosecuting the work. From this it is concluded that the defendant had disabled himself from the performance of a material part of the contract, which authorized the complainant to rescind.

Before a party to the contract can assume the right to rescind for the default of the other party, the default must be of such character as indicates an intent upon the part of the defaulter to abandon the contract. Lord Coleridge, in *Freeth* v. *Burr,* L. R., 9 C. P., 208, states the rule thus:

"In cases of this sort, where the question is whether the one party is set free by the action of the other, the real matter for consideration is whether the acts or conduct of the one do or do not amount to an intima-

tion of an intention to abandon and altogether refuse performance of the contract. I say this in order to explain the ground upon which I think the decision in these cases must rest. There has been some conflict among them. But I think it may be taken that the fair result of them is as I have stated, *viz.,* that the true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract."

See *Lake Shore & M. S. R. Co.* v. *Richards,* 152 Ill., 59, 38 N. E., 773, 30 L. R. A., 33, and the very full annotator's note

Upon the facts of this case, it cannot be assumed that the defendant had intended to abandon the property. He was actively engaged in the performance of the work with a large equipment of men, machines, animals, and things before and at the time the complainant annulled the contract. There is nothing in the record from which the complainant could be justified in believing that the defendant had any such intention, and, indeed, as we understand the insistence of the complainant, the default claimed is that the defendant had disabled himself to perform the contract within the time limit agreed upon. This disability need not necessarily be such as prevents the discharge of every obligation of the contract. But the inability to perform the contract in respect of matters which would render the performance of the rest a thing different in substance of the thing contracted to be done will justify the party not in default in abandoning the contract. Assuming that the

defendant could not complete the work within the time, is this such a disability as works a destruction of the contract, and authorizes the complainant to declare it at an end in anticipation of the breach in the absence of proof of special damages on account of the delay? As a general rule time is not of the essence of working contracts, and where the contractor fails to perform his work within the specified time he is liable in damages only for the delay. 6 Cyc., 67. And the failure to complete the work within the time does not *ipso facto* terminate the contract. It may be terminated after the expiration of the time at the election of the injured party.

While it is clear that time is of the essence of this contract, and is a material part of it, we do not hold that the complainant can anticipate a failure to perform within the time at so remote a period from the time of performance as in this case, and annul the contract, charging the defendant with a disability to perform it. Conceding for the purpose of the point, that it was impossible for the defendant to do the work within the time, this cannot be said to be a total disability to perform the contract, nor such a disability as that, if the contract is performed under it, it would be something other and different from the thing contemplated by the parties. Certainly the defendant was able to perform the contract by an extension of the time limit. There was no defalcation in the grade and quality of the work. The defendant was entitled to a *pro tanto* performance for the full time limit as long as he com-

Brady v. Oliver.

plied with the specifications of the contract in the performance, in order to reduce his liability for the breach. Had he failed to complete the contract within the time, he would have been liable for such damages as complainant would have sustained because of the default, and likewise he was entitled to the benefit of all the money he could have earned under it within the time. The complainant was not justified in doing anything that would increase the liability of the defendant, notwithstanding an immaterial breach. See authorities, supra. In all of the cases which we have seen, where the injured party has anticipated a breach and claimed a default justifying an abandonment of the contract, the disability to perform has been total, or the defendant has renounced the contract and refused to proceed under it. But those are quite different cases to this. The defendant not only had not renounced the contract and had not refused to proceed under it, but was actively engaged in its performance. But merely because complainant had reason to believe that defendant would breach his contract, he was not justified in rescinding it in anticipation of the breach. In order to justify rescission, there must be actual default, unequivocal renunciation, or legal disability to perform. The disability cannot be anticipated; but, after it occurs, the nonperformance may be. The disability must be so complete as to place it beyond the power of the defaulting party to perform his obligations in every material respect, so that, if the things contracted for are done in the best way the disabled party can do them, the contract, so performed, will be

essentially another and different thing. It must exist at the time of the renunciation as a legally accomplished fact, and not as a mere potentiality. Therefore it must clearly appear, not only that defendant could not do the work within the time, but that his failure in respect of this matter would be so material as to make his performance essentially different from his promise. If he should default in one day, or one week, or one month of the time, this would not necessarily justify a rescission. It would depend upon the effect of the delay upon the essential objects to be accomplished by the performance. A case can be conceived where a default of one day might defeat the whole purpose of the contract. But generally such is not true of working contracts. No such case is made here. There is no suggestion of special damages to be suffered by complainant from delay; and hence, if default be assumed, it is not shown to be of such essential character as to be without the contemplation of the contract.

What we have said before has been with reference to the law of contracts as administered by courts of equity, and without regard to the stipulation of the parties with respect to their remedies upon the default of either. It is insisted by complainant that under clause 8 the defendant had defaulted "to promptly and properly proceed with and complete the work." This clause was construed by him to justify a termination of the contract for a default in promptly and properly proceeding with the work. It is conceded, of course, that the defendant was under no obligation to have the work completed

on the 6th of December, 1907, because under the terms of the contract he had more than three months in which to complete the power house construction and more than twelve months in which to complete the balance. It is well settled that provisions in working contracts like clauses 6, 7, and 8 of the one under consideration will be given their proper force and effect by the courts. It is equally well settled that clauses like 8, inflicting severe and drastic penalties for nonperformance, are not favored by the courts, and are to be strictly construed. 30 Am. & Eng. Enc. of Law, supra. Clause 7 of the contract provides a remedy for the owner in case of a failure upon the part of the contractor to sufficiently progress the work, and whether there has been default in its progress is left to the opinion of the complainant's engineer. The remedy there provided is for an increase of the force at the expense of the contractor. That remedy, of course, contemplates speeding the work before the expiration of the time limit. The remedy provided in section 8 is the right to annul and cancel the contract, and to relet the work, or otherwise prosecute it. It provides a forfeiture upon the part of the contractor of all claims for damages for the annulment, without depriving the complainant of his right to damages against the contractor for any default of his. Likewise all moneys due the contractor, or retained under the contract are to be forfeited to complainant. But this forfeiture does not release the contractor from the fulfillment of the contract, but he and his sureties are still liable to the complainant for all loss and damage

which may have resulted from the default. It is true that the contractor is to be credited with the amount of the moneys so forfeited, provided the complainant is entitled to a greater sum on account of the contractor's default. A mere statement of the provisions of this clause of the contract is convincing that the parties did not contemplate that its severe penalties were to be visited upon the contractor for a default in progressing the work. This is true, not only because the parties most likely would not have assented to terms of such extreme severity, but because of the language of the contract itself. It is expressly declared that such forfeiture shall "not release such contractor from the fulfillment of this contract." This could not be true, if the complainant has the power to anticipate a breach of the contract by the defendant, and annul it, and then visit upon him the forfeiture provided for. So we are of opinion that neither under clause 8, nor the general law governing contracts, was the complainant justified in arbitrarily annulling the agreement before the expiration of the time limit.

Having concluded that the complainant was not authorized to terminate the contract at the time he did, it necessarily follows that he breached it in so doing. We do not understand that this is controverted; but it is claimed that, if the contract was wrongfully terminated by the complainants, defendant is without remedy, for the reason that it would have cost him more to complete it than he could have earned under it. It is quite true that either party to a contract has the

legal right to abandon or renounce it at his will, sub-
mitting to the legal consequences thereof. *Ault* v. *Dustin,*
100 Tenn., 383, 45 S. W., 981.   And that the measure of
damages is actual compensation in all instances where
the nature of the case admits of the rule.   *Railroad* v.
*Guinam,* 11 Lea, 103, 47 Am. Rep., 279.   And generally
the value of the contract is the difference between the
price agreed to be paid and the cost of performance to
the complainant.   *Singleton* v. *Wilson,* 85 Tenn., 344,
2 S. W., 801.   But in the foregoing class of cases the
court was speaking of the measure of damages for a
default in performing the contract.   Naturally, where
one sues upon the contract, claiming rights under it, the
measure of his recovery is the value of the contract
itself.   Such, however, is not this case.   When the com-
plainant wrongfully ordered the defendant to vacate the
premises and desist in further performing the contract,
he renounced the contract and left it to the option of
the defendant to treat it as rescinded.   *Wright* v.
*Haskell,* 45 Me., 489; *Miller* v. *Thompson,* 22 Ark., 258.
In *Lake Shore & M. S. R. Co.* v. *Richards,* supra, the
rule is clearly stated thus:

"It is well settled that where one party repudiates
the contract, and refuses longer to be bound by it, the
injured party has an election to pursue either of three
remedies.   He may treat the contract as rescinded, and
recover upon *quantum meruit* so far as he has per-
formed; or he may keep the contract alive for the benefit
of both parties, being at all times himself ready and
able to perform, and, at the end of the time specified

in the contract for performance, sue and recover under the contract; or he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing. In the latter case the contract would be continued in force for that purpose. Where, however, the injured party elects to keep the contract in force for the purpose of recovering future profits, treating the contract as repudiated by the other party, in order to such recovery the plaintiff must allege and prove performance upon his part, or a legal excuse for nonperformance."

As a general proposition, neither party to a contract can rescind without restoring the *status quo*. He cannot repudiate the terms of the contract, and refuse to perform his part of it, and at the same time claim the benefits which he has derived from it. In a court of equity, in all matters of rescission, and in all relief akin to rescission, the parties will invariably be placed in *statu quo*. *Curtis* v. *Brannon*, 98 Tenn., 161, 38 S. W., 1073, 69 L. R. A., 760; *Hill* v. *Harriman*, 95 Tenn., 305, 32 S. W., 202, and the authorities there cited.

The only recovery sought by cross-complainant is for moneys expended in work preparatory to the performance of the contract and the moneys actually earned in the performance. The complainant, Brady, has received the full benefit of all the moneys expended by the defendant, Oliver, and there is no rule of law by which he can retain these benefits without compensation. The chancellor did not award profits, and none are claimed

here. Of course, before profits could be recovered, the cross-complainant would have to show full performance upon his part, or else that he stands ready to perform. But claiming, as he does, nothing more than compensation for the outlay of labor and money expended upon the property, he is not required to show that he did or could perform the contract. It is only necessary to show that in good faith he was in the due and proper performance of his part of the contract when it was wrongfully terminated by the complainant. In this view, it is not necessary to determine whether he could have performed the contract within the time. The contract may be considered as rescinded by mutual consent. When the complainant abandoned it, the defendant accepted the rescission, and now demands, and only demands, that the complainant restore the *status quo* as far as possible. That he is entitled to this is beyond controversy upon all of the cases. The real distinction between the cases which might seem to hold a contrary view lies in the fact that in those cases the suit was upon the contract. In that event the measure of damages is the value of the contract; but in this case the contract is terminated by the conduct of the parties, and the cross bill seeks to recover, not the value of the contract nor damages for its breach, but the outlay of the cross-complainant in his effort to perform it prior to the rescission. Mr. Sutherland states the rule under discussion thus:

"A contractor whose performance of his contract has been illegally stopped may recover for work necessarily

done or expense necessarily incurred in preparation for its performance, although he could not have recovered for it if there had been a full performance. If the contractor has derived any benefit from such work or expense, its value must be deducted from the cost thereof. This right of recovery is distinct from the right to recover profits. When those are recovered, the former is included." 3 Sutherland on Damages, par. 713, pp. 2182, 2183.

The text is supported by many adjudicated cases, some of which are: *Cederberg* v. *Robison,* 100 Cal., 93, 34 Pac., 510; *Taylor Mfg. Co.* v. *Hatcher Mfg. Co.* (C. C.), 39 Fed., 440, 3 L. R. A., 587; *McElwee* v *B. L. & I. Co.,* 54 Fed., 627, 4 C. C. A., 525; *Griffith* v. *Blackwater, B. & L. Co.,* 55 W. Va., 604, 48 S. E., 442, 69 L. R. A., 124; *Worthington* v. *Gwin,* 119 Ala., 44, 24 South., 739, 43 L. R. A., 382; *United States* v. *Behan,* 110 U. S., 338, 4 Sup. Ct., 81, 28 L. Ed., 168. In the case last cited it was said: "Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the government should have proven this fact. It will not be presumed. . . .

"The party who voluntarily and wrongfully puts an end to a contract, and prevents the other party from performing it, is estopped from denying that the injured

party has not been damaged to the extent of his actual loss and outlay fairly incurred."

As heretofore stated, the chancellor decreed a recovery in favor of the cross-complaint to "compensate him in the amount expended by him in good faith and in the exercise of reasonable judgment in preparing to perform and in actual performance of the contract. And it appearing from the evidence, and not being controverted or disputed, that the total expenditures of the said Oliver in preparing for and in carrying on and performing said contract amounted to the sum of $673,974.86, and there being no evidence that any part of said expenditures were unreasonable or improper, and it further appearing that the total of the amounts paid to said Oliver on account of the work done by him under said contract and the amounts realized by him for the sale of his plant, equipment, machinery, etc., which he had accumulated for the performance of said contract, is the sum of $243,445.28, it is adjudged that the difference between said amounts, being the sum of $430,529.58, is the amount to which said Oliver is entitled as damages aforesaid." In this court in brief of counsel it is said: "Incidentally we might remark that, even if the decree was based upon the correct principles, there was no sufficient evidence, from which to determine what defendant's proper and reasonable expenditures were. All we have is a five-line statement made from defendant's books, purporting to give the cost of plant, materials, supplies, and labor, and concluding with the vague

statement, 'Other expenses not included in above, $75,963.03.'"

It is true that the statement in the testimony of the defendant's bookkeeper is very brief, but it is not true that the statement is vague or indefinite. Nothing appearing to the contrary, the testimony of this witness is sufficient to establish the facts testified to by him. The result of the foregoing is that all of the complainant's assignments of error are overruled.

The cross-complainant has filed the record for writ of error, and has assigned as error that the chancellor should have decreed in favor of him in the sum of $435,526.88, instead of $430,529.58. We think this assignment should be sustained. The witness upon whose testimony the decree of the chancellor is based as to the amount of the cross-complainant's expenditures, and the amount which he has been paid, shows that the difference between these two amounts is the former sum, instead of the sum decreed by the chancellor.

It is also assigned as error that the chancellor should have allowed interest upon the sum decreed the cross-complainant from the date of the cancellation of the contract, December 6, 1907. This assignment is not well taken to the full extent claimed by it. Interest should have been allowed from the date of the filing of the cross-bill. With the modifications herein indicated, the decree of the chancellor is affirmed.