FIRST NATIONAL BANK OF
ABERDEEN, Appellant,

v.

INDIAN INDUSTRIES, INC., Appellant,

v.

CHEYENNE RIVER HOUSING
AUTHORITY, Appellee,

and

FIDELITY AND DEPOSIT CORPORA-
TION OF MARYLAND,

v.

George Steven LONG, a/k/a Steve Long,
and J. W. Cloer.

No. 78–1758.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1979.

Decided June 6, 1979.

George A. Bangs of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S. D., argued, for appellant; Joseph M. Butler, Rapid City, S. D., and Newell E. Krause of Lakeman & Krause, Mobridge, S. D., on brief.

Francis J. O'Toole of Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., (argued), Richard Schifter and Theodore C. Hirt, Washington, D. C., and Donald J. Coleman, Dupree, S. D., on brief, for appellee.

Before GIBSON, Chief Judge, and ROSS and McMILLIAN, Circuit Judges.

ROSS, Circuit Judge.

This is an appeal from a judgment[1] in favor of the Cheyenne River Housing Authority (CRHA) against Indian Industries, Inc. (I.I.) on I.I.'s third-party complaint for breach of contract and on the housing authority's counterclaim. We affirm.

In 1961 the Cheyenne River Sioux Indian tribe chartered CRHA for the purpose of

---

1. The Honorable Fred J. Nichol, Chief Judge, United States District Court for the District of South Dakota.

improving housing conditions, providing employment and alleviating the housing shortage on the Cheyenne River Sioux Reservation in South Dakota. In late 1970, the Department of Housing and Urban Development (HUD) appropriated $4,308,748.00 for the construction of 240 dwelling units to be inhabited by low-income families on the reservation.

Indian Industries, Inc., a construction company, was chartered in Montana in June 1971 by George Steven Long and two Montana attorneys after Mr. Long learned in April 1971 of HUD's appropriation for the Cheyenne River Reservation.[2] Mr. Long submitted a proposal to complete the project on a "turnkey" basis,[3] and CRHA accepted I.I.'s bid.

The contract, signed July 8, 1971, required I.I. to begin construction within 10 days thereafter and to "prosecute such construction in a timely and deligent [sic] manner" to completion within 540 days after the contract date. I.I. agreed "to keep [CRHA] informed as to an estimated construction completion date, and all revisions which may develop with respect to this date."

Of the 240 units, 186 were to be located in 13 cluster sites, and 54 were to be constructed on scattered sites throughout the reservation. As I.I. prepared to begin work at a particular location, CRHA was to provide a lease for that site. The parties attached a construction schedule to the contract contemplating the order in which sites were to be completed. However, the record indicates that the housing authority was willing to permit construction on any sites selected by the contractor and did not intend to insist on completion in the particular sequence set forth in the schedule. As I.I. finished work at each site, CRHA was to accept the habitable units and pay for them in increments. The contractor was to hire local workers on the reservation and train them in the building trades.[4] Additional funds were to be provided for such training.

The district court found that I.I.'s undertaking was beset by difficulties from the start. The company began work late, lost or never obtained permanent financing, experienced shortages of equipment and supplies and made minimal progress on the job. By January 1972, the project was virtually at a standstill, and by the middle of February, all work ceased. During this period, the company's managerial personnel resigned, and eventually 32 liens were filed against the project.

In March 1972, the housing authority passed a resolution to require the contractors to "furnish definite written proof of their capability to continue the project in a timely and diligent manner to a successful completion by December 31, 1972," resolving that in the absence of such assurances, "it is recommended  *  *  *  that the Contract of Sale be terminated  *  *  *."

Mr. Long responded for I.I. by a letter of March 14, 1972, in which he essentially blamed the housing authority and HUD for all of the problems his company had experienced on the project.

On the other hand, I.I.'s partner, Cheyenne River General Contractors, responded on March 17, 1972, as follows:

Indian Industries, the venture partner that was given complete control and responsibility has demonstrated that it has neither financing capacity or construction ability. Nor does it have the ability to

---

**2.** Indian Industries, Inc. was chartered in Montana, and at the time of suit, its principal place of business was in Denver, Colorado. The Cheyenne River Housing Authority is a South Dakota entity, and the parties are therefore of diverse citizenship. 28 U.S.C. § 1332(a).

**3.** A "turnkey" contract is technically a contract of sale. The developer (or seller) obtains his own funds for construction. There are no progress payments or liquidated damages provisions. The contractor does not have to fur-

nish a performance bond, and the arrangement therefore has advantages for minority contractors who may lack substantial bonding capacity. The purchaser agrees to accept and pay for the units when they are completed and habitable, i. e., when the purchaser can "turn the key" and move in.

**4.** Cheyenne River General Contractors, wholly owned by Indians on the reservation, was I.I.'s joint venture partner and was to supply Indian workers for the project.

work with other Indian minority group companies. Contractors was left out of almost all construction decisions made by Indian Industries. While Contractors and local Indian laborers waited for further instructions and plans, Indian Industries has postponed meetings, and failed to communicate.

Indian Industries also operates in the shadow of an investigation of some of its officers and employees who were involved in the serious financial setback discovered in the housing project on the Fort Belknap Reservation.

Cheyenne River General Contractors cannot speak for Indian Industries' ability to complete the Project by December, 1972.

Then on April 12, 1972, CRHA issued the following notice to I.I., cancelling the contract:

This is to notify you that the Cheyenne River Housing Authority herewith exercises their right to rescind the contract dated the 8th day of July, 1971, by and between said Indian Industries, Inc., and Cheyenne River Housing Authority as Purchasers * * *. This notice of rescission is herewith served on you because of your substantial and fundamental nonperformance of the contract terms such as to defeat the object of said contract and because of your apparent failure to diligently and timely proceed with said contract; and for the further reason that you failed to comply with the provisions of said Housing Authority's Resolution of March 1, 1972.

## I.

■ The district court found that the evidence established I.I.'s inability to perform its contract obligations and that the housing authority was therefore justified in terminating the agreement before the completion date.

I.I. contends on appeal that even if the evidence indicated that it could not have completed construction on time, the company might eventually have substantially performed its obligations. I.I. relies on *Brady*

*v. Oliver,* 125 Tenn. 595, 616, 147 S.W. 1135, 1140 (1911) for the general rule that ordinarily time is not of the essence in construction contracts and that "where the contractor fails to perform his work within the specified time he is liable in damages only for the delay."

However, I.I. has not answered CRHA's argument that termination was justified not because of the contractor's delay but because of the virtual certainty that I.I. would never be able to perform its contract obligations. CRHA urges that this case presents the unusual circumstance referred to in *Brady v. Oliver, supra,* in which prospective breach and failure of consideration have been conclusively established in advance of the completion date because the contractor has disabled himself from performing:

*The disability must be so complete as to place it beyond the power of the defaulting party to perform his obligations in every material respect, so that, if the things contracted for are done in the best way the disabled party can do them, the contract, so performed, will be essentially another and different thing. It must exist at the time of the renunciation as a legally accomplished fact, and not as a mere potentiality. Therefore it must clearly appear, not only that defendant could not do the work within the time, but that his failure in respect of this matter would be so material as to make his performance essentially different from his promise.*

*Id.* at 1140 (emphasis added). See also, Restatement of Contracts § 280(1) and Comment *a* to section 280:

MANIFESTATION BY ONE PARTY OF INABILITY TO PERFORM OR OF INTENTION NOT TO PERFORM.

(1) Where there are promises for an agreed exchange, if one promisor manifests to the other that he cannot * * * substantially perform his promise, * * * the other party is justified in changing his position, and if he makes a material

change of position he is discharged from the duty of performing his promise.

\* \* \* \* \* \*

*Comment on Subsection* (1):

a. The rule stated in Subsection (1) is an illustration of the principle that prospective failure of consideration is as good ground for excusing performance of a promise as actual failure of consideration. Where there has been actual non-performance, however, failure is certain, while when non-performance is prospective degrees of probability enter into the case. So far as concerns a discharge of a promisor because it is probable that the return promise will not be performed, it makes no difference whether the prospective failure is due to inability or wilful purpose, provided that it is certain that the failure is going to take place.[5]

The district court relied on the following evidence of I.I.'s inability to perform. I.I.'s first general manager and construction superintendent left in August 1971 because he had not been paid. James F. Stone became general manager in August. However, the project was without a construction superintendent until Ray Mudge assumed that position on September 16, 1971. Mr. Stone testified that apart from "token" construction in August, the project was initially delayed for "60 days, due to lack of funding \* \* \* from the contract start time until

Mr. Mudge arrived on the job." Ray Mudge testified that when he arrived in September, he found no equipment with which to begin work; "[w]e had a few shovels and a backhoe that almost worked. That was about it." Mr. Mudge attributed I.I.'s subsequent lack of progress to a constantly inadequate supply of equipment, materials and personnel.

In January 1972, both Mr. Mudge and Mr. Stone resigned, leaving the project without management and supervision. Mr. Mudge left because "the project had come to a standstill." Workers had to be laid off, and no materials had been delivered since December 17, 1971. Mr. Stone resigned because of lack of funds and materials and "because an agreement had not been kept with me that I was to be allowed to do the accounting of the funds, and when I added up the funds, they were not all there, and I did not like to work under the conditions that I was responsible for something and could not have control over it."

CRHA's Executive Director, Lloyd LeBeau, testified that as of February 15, 1972, I.I. ceased work altogether and left the project. I.I. subsequently claimed that winter weather had necessitated a temporary cessation of work until spring. However, Mr. LeBeau stated that in February before it left the site, I.I. had been working indoors and could have continued to do so.

---

5. *See also* 6 S. Williston, Contracts § 875 (1962):

The same principle of justice which forbids the enforcement of a promise when the counter-promise has been broken also forbids enforcement when it is evident that the counter-promise will be broken. Prospective failure of consideration is as good an excuse as actual failure. The only difficulty is to determine when it is sufficiently certain that there will be non-performance of a counter-promise due in the future to justify non-performance of a promise due in the present.

*Accord,* A. Corbin, Contracts §§ 1259–61 (1952):

[I]f substantial performance by one who has promised to do construction work becomes impossible, the other party is no longer bound to continue making instalment payments and can get judgment for restitution of instalments already paid.

\* \* \* \* \* \*

A promisor is not justified in failing to render his promised performance by the mere fact that he reasonably believes that there will be a failure of consideration in the future. A prospective failure is more difficult to prove than is an already existing failure. It is determined by process of prediction, not by history. \* \* \* It seems enough to say that the court must be thoroughly convinced that the agreed equivalent will not be rendered. The plaintiff certainly should be given ample opportunity to show that present appearances are not final or conclusive, and even to give security in some reasonable form that he will perform when the time comes.

\* \* \* \* \* \*

The insolvency of a building contractor, with added proof of his inability to get labor and materials on credit, may be sufficient showing of prospective failure of performance.

Mr. Stone agreed, stating that during the time he managed the project until January 27, 1972, I.I. had made no plans to close down the project for the winter, and in fact there were plumbing, painting and electrical installations to be done indoors during cold weather.

Mr. Carr, architect for the project, reported that CRHA became concerned about I.I.'s lack of construction progress by March 1972 because

we [had] used up half of the time, we had six percent of the work done, we had liens falling against the project, we had suffered approximately a two month period in which no one was on the project providing any work. There was no particular assurances from anybody that they were going to come back, and all of the chief officers of the company had left. The Housing Authority had no reason to assume that they were ever going to come back.

By the termination date in April, $88,000.00 in suppliers' and subcontractors' liens had been filed against the project.

It is clear that the lack of appreciable progress and the delays, liens, resignations, shortages and cessation of work derived primarily from I.I.'s inability to obtain financing.

When the contract was executed, Mr. Long, I.I.'s president, had a financing commitment from the First National Bank of Circle, Montana, owned by Ed Towe. In August 1971, I.I. assigned all proceeds from the contract with CRHA to the Circle Bank as collateral. However, later that month the Circle Bank withdrew its commitment.

In September 1971, the AFL–CIO Mortgage Trust Fund tentatively agreed to a loan. Mr. Long then assigned the proceeds of the CRHA contract to this lender without obtaining a release of the Circle Bank assignment. In December 1971, the AFL–CIO Fund withdrew its commitment.

On December 31, 1971, the Kissell Company, mortgage bankers in Springfield, Ohio, made a commitment to lend $3,955,430.00. Once again Mr. Long assigned the proceeds of the contract without obtaining releases of the prior assignments.

In the meantime, Mr. Long and another officer of I.I. obtained relatively small interim loans from the Baker National Bank of Baker, Montana, owned by Ed Towe, and the First National Bank of Aberdeen in Mobridge, South Dakota.

After providing some funds, the Kissell Company suspended or terminated its commitment for permanent financing on February 9, 1972. Kissell wanted evidence that the Circle Bank and Bank of Aberdeen had released all interest in the proceeds of the construction contract. However, Mr. Towe or the Circle Bank refused to execute a release. Thus a complete impasse existed in early February 1972, leaving I.I. without any source of funds with which to continue construction. Within a week, I.I. left the project, purportedly because of the weather.

The district court found that by April 1972, half of the contract time had expired; six percent of the work had been accomplished; no site had been completed; I.I. had left the project for eight weeks, and no immediate source of financing was available. These findings are not clearly erroneous. In fact, the record contains no evidentiary support at all for I.I.'s assertion on appeal that substantial performance on time or even within a reasonable time thereafter was still possible.

II.

In the alternative, I.I. maintains that its delays, lack of progress and financing difficulties were caused by the housing authority, and that CRHA was therefore in default. The district court exhaustively reviewed each of I.I.'s contentions in this regard and rejected them all. We agree.

I.I. asserts that its inability to obtain financing was caused by the housing authority's failure to make leases to the sites available upon request. This contention is belied not only by the testimony of Mr. Stone and Mr. Mudge but by Mr. Long's admissions to the contrary.

At most, CRHA caused an initial delay of one week by lease unavailability. Thereafter, I.I. lacked the funds, crew and equipment to expand its operations beyond the three sites originally undertaken despite the availability of additional leases.

In August 1971, four of the 13 cluster sites were rejected by the Public Health Service, and the CRHA notified I.I. that 41 housing units should be built on other existing sites. The district court correctly found that this consolidation of sites benefited the contractors by reducing the total number of sites for construction. Then in January 1972, CRHA relocated some of the scattered sites. However, I.I. was unaffected by these changes, as the company had never progressed beyond the three sites originally undertaken and by January had reached a stalemate because of lack of funds.

I.I. also charges that it was delayed by an alleged failure of CRHA to coordinate the activities of federal agencies involved in the project. This claim is refuted by the evidence that HUD's disbursement of funds and the Public Health Service's responsibility to connect dwelling units to utilities were to arise only upon completion of each housing site. As stated previously, no site ever reached substantial completion. HUD apparently warned CRHA not to make payments upon completion of any sites pending an investigation by the Internal Revenue Service of Mr. Long's failure to fulfill payroll withholding tax obligations. However, Mr. Long settled this matter, and at any rate, I.I. never became entitled to any payment.

Finally, we agree with the district court that I.I. had the duty to arrange financing and to resolve the problem of conflicting contract assignments. The failure to procure releases of the prior assignments cannot be attributed to CRHA.

*Namekagon Dev. Co., Inc. v. Bois Forte Reservation Housing Authority,* 395 F.Supp. 23 (D.Minn.1974), *aff'd,* 517 F.2d 508 (8th Cir. 1975), upon which I.I. relies, is inapplicable. In that case under a similar turnkey arrangement, the housing authority was held primarily responsible for the construction delays and was therefore unjustified in cancelling the contract. Damages were awarded to the contractor but were apportioned according to the parties' relative responsibility for the delays. In the present case, we affirm the district court's finding that I.I. was solely and entirely responsible for the delays, lack of progress and inability to complete the project.

### III.

■ Finally, I.I. alleges that CRHA did not terminate the contract but "rescinded" it, entitling I.I. to recover in *quantum meruit* for the value of such work as it did perform. The district court credited the testimony of Don Coleman, the attorney for CRHA, that the housing authority did not intend rescission despite its use of that word in its termination letter of April 12, 1972. *Cf. Illges v. Congdon,* 248 Wis. 85, 21 N.W.2d 647 (1946) (" '[W]hether a contract is spoken of as terminated, abrogated, annulled, avoided, discharged, or rescinded is not in itself important. There are, however, several sources of unnecessary confusion in the use of these common words "rescind" and "rescission." ' ") (Citations omitted.) According deference to the factual findings of the district court who heard and observed the witnesses, Fed.R.Civ.P. 52(a); *Bright v. Taylor,* 554 F.2d 854, 856 (8th Cir. 1977), we think this finding was not clearly erroneous.

■ Moreover, even if CRHA had intended to rescind the agreement, it would be liable in *quantum meruit* only for the value of benefits conferred by I.I. *Ringgenberg v. Wilmsmeyer,* 253 N.W.2d 197, 202 (S.D. 1977). The record demonstrates not only that no benefit was conferred in this case, but that substantial additional costs were incurred by the housing authority when the project was relet. Furthermore, there was some evidence of defects in the six percent of the work that had been completed.

The district court awarded CRHA $630,-194.00 in damages on its counterclaim against I.I. for breach of contract. The

parties stipulated to this amount as the additional costs incurred by CRHA when the contract was relet.

■ Ordinarily prospective failure of consideration operates as a discharge of the nondefaulting party's duty under the contract, as he is not required to perform a useless act when it is clearly established that the promised equivalent will not be forthcoming. Because of the prospective nature of the proof of default, there is no actual breach of contract until performance is actually due. However, as in this case, a change of position may be justified by the prospective breach, and once the time for performance arrives, the party who relied on the evidence of prospective nonperformance may maintain an action for damages. *See* Restatement of Contracts § 323(1):

**EFFECT OF APPARENT INABILITY OR OF EXPRESSIONS OF DOUBT FOLLOWED BY CHANGE OF POSITION.**

(1) Where a party to a contract materially changes his position in reasonable reliance on the other party's

(a) manifestations of unjustified lack either of intention or of ability, or

(b) apparent inability without justification to perform a condition or a promise for an agreed exchange, a subsequent tender of correct performance by the latter party is inoperative to prevent the occurrence of a breach of contract by him at the time when performance becomes due.

And *see Comment b* to section 323:

It may be supposed that a party unjustifiably manifesting unwillingness or inability continues in the same state of mind or lack of ability *when the time for his performance arrives*. In that case there is necessarily a breach of contract.

(Emphasis added.) *Accord*, A. Corbin, Contracts § 1255 (1952).[6]

The district court reached the same result although by a different process of reasoning. We therefore affirm the district court's award of damages on CRHA's counterclaim.

The judgment of the district court is affirmed.

---

**6.** Discharge by Failure of Consideration Either Existing or Prospective

In the case of a promise that is not entirely independent, the promisor may be discharged by his failure to receive the agreed equivalent for which his promised performance was to be exchanged. * * * In such a case, if the promisor has not received and is not going to receive the agreed equivalent of his own performance, he will not be required to perform at all. * * * In most cases, doubtless, when the parties have agreed upon an equivalent to be exchanged for a promised performance, the contract is put into a bilateral form, with a return promise to render the agreed equivalent. In such a case failure of consideration may also be a breach of contract; and the discharge could be called a discharge by breach, as well as a discharge by failure of consideration.

A. Corbin, Contracts § 1255 (1952). *Cf., Amberg Granite Co. v. Marinette County*, 247 Wis. 36, 40–43, 18 N.W.2d 496, 498–99 (1945):

Although there is a claim by plaintiff of being capable of living up to its agreement, the evidence shows an inability which amounts to an absolute and unconditional disclosure of intention to default unless it could induce concessions of considerable consequence from defendant.

* * * * * *

Although a mere anticipation that a contractor will not be able to perform may not be sufficient to justify treating the delay as a total default, still where the contractor who is months behind a schedule agreed upon demands more time and the circumstances of the case show that time is material and is of the essence of the contract, a termination of the contract is justified.

* * * * * *

The defendant, of course, was entitled to have the work and material plaintiff had engaged to deliver for the contract price * * at or about the time which the parties had agreed upon. And it is entitled to be placed in the position in which it would have stood had plaintiff carried out its agreement.