NAMEKAGON DEVELOPMENT COMPANY, INC., Plaintiff,

v.

BOIS FORTE RESERVATION HOUSING AUTHORITY et al., Defendants.

Civ. No. 5–74–20.

United States District Court, D. Minnesota, Fifth Division.

Oct. 9, 1974.

24

Tyrone P. Bujold, Hanft, Fride, O'Brien & Harries, Duluth, Minn., for plaintiff.

Darrell B. Johnson, Fredrikson, Byron, Colborn, Bisbee, Hansen & Perlman, Minneapolis, Minn., for Bois Forte Reservation Housing Authority and Business Committee.

Robert G. Renner, U. S. Atty., and Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., for United States.

MEMORANDUM OPINION

HEANEY, Circuit Judge, sitting by designation.

This action for damages was brought by the Namekagon Development Corporation against the Bois Forte Reservation Housing Authority, the Bois Forte Reservation Business Committee, and the United States of America. Namekagon claimed damages of $600,000 for

**26**

breach of two contracts for the construction of turnkey housing projects on the Bois Forte Reservation. Namekagon alleged that it had performed work for which it was not paid when it was wrongfully ejected from the reservation and prevented from completing performance.

## JURISDICTION

All defendants made motions to dismiss the action. During the trial, the Court granted the motion of dismissal in favor of the United States, on the ground that the amount claimed was in excess of $10,000, and the Tucker Act limits the jurisdiction of the District Court to contract claims against the United States which do not exceed that amount. 28 U.S.C. § 1346(a)(2). *See,* Thompson v. United States, 408 F.2d 1075 (8th Cir. 1969); Murray v. United States, 132 U.S.App.D.C. 91, 405 F.2d 1361, 1366 (1968); Cenna v. United States, 402 F.2d 168 (3rd Cir. 1968). In light of that dismissal, the plaintiff requested that the Court transfer the action against the United States to the Court of Claims pursuant to 28 U.S.C. § 1406(c). That request is granted in a separate order dated this day.

The Court also granted dismissal in favor of the Bois Forte Reservation Business Committee, since that committee was but a governing body of the Minnesota Chippewa Tribe, and the Tribe had not waived its sovereign immunity by consenting that either it or the committee might be sued. *See,* United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); Turner v. United States, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919); Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529 (8th Cir. 1967); Thebo v. Choctaw Tribe of Indians, 66 F. 372 (8th Cir. 1895).

■ Throughout the trial, however, the Court reserved its ruling on the motion of the Bois Forte Reservation Housing Authority to dismiss as to it. The Court now denies that motion and holds that the Housing Authority is a separate corporation not cloaked with the Tribe's legal immunity.[1] It does so because it believes that sovereign immunity of corporations created by Indian Nations should be confined in the same manner as corporations created by the United States.

■ Congress can, if it so chooses, cloak federally-created corporations with the mantle of sovereign immunity. *See,* Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 389, 59 S.Ct. 516, 83 L.Ed. 784 (1939). Almost without exception, however, the courts have found that Congress intended that such corporations be open to suit in the same manner as other corporations. *See, e. g.,* Brady v. Roosevelt Steamship Co., 317 U.S. 575, 63 S.Ct. 425, 87 L.Ed. 471 (1943); Federal Housing Administration v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940); Keifer & Keifer v. Reconstruction Finance Corp., *supra*; Knowles v. War Damage Corp., 83 U.S. App.D.C. 388, 171 F.2d 15, 19 (1948), cert. denied, 336 U.S. 914, 69 S.Ct. 604, 93 L.Ed. 1077 (1949). Frequently, the courts have pointed to language in an Act of Congress providing that the particular governmental corporation has power to "sue or be sued," finding in that clause an expression of congressional will that the corporation should not be endowed with sovereign immunity. *See, e. g.,* Federal Housing Administration v. Burr, *supra* at 244, 60 S.Ct. 488; Knowles v. War Damage Corp., *supra* at 19; Reconstruction Finance Corp. v. Langham, 208 F.2d 556, 559 (6th Cir. 1953). But *Keifer* made it clear that such a clause is not necessary, and that an intention to withhold immune status

---

1. Hickey v. Crow Creek Housing Authority, 379 F.Supp. 1002 (D.S.D., 1974), reached a contrary conclusion on somewhat similar facts. That court, however, did not examine the line of precedents which will be discussed in support of the ruling here.

can be implied from the circumstances surrounding the corporation's creation and operation:

 \* \* \* As to the states, legal irresponsibility was written into the Eleventh Amendment, Const. U.S.C.A.; as to the United States, it is derived by implication. \* \* \* But because the doctrine gives the government a privileged position, it has been appropriately confined.

 Therefore, the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work. \* \* \* For more than a hundred years corporations have been used as agencies for doing the work of the government. Congress may create them "as appropriate means of executing the powers of government \* \* \*". But this would not confer on such corporations legal immunity even if the conventional to-sue-and-be-sued clause were omitted. \* \* \*

Keifer & Keifer v. Reconstruction Finance Corp., *supra* at 388–389, 59 S.Ct. at 517 (Citations and footnote omitted.).

The Eighth Circuit has expressed the doctrine in an even more positive way: " \* \* \* [G]overnment-created corporations are not immune from suit unless expressly so created." Foster v. Day & Zimmermann, Inc., 502 F.2d 867, at 874, n. 6 (8th Cir., 1974).

■■ To hold the Housing Authority vulnerable to suit, we need not go as far as the Eighth Circuit would go since the Ordinance creating the corporate Housing Authority included a sue-and-be-sued clause not unlike the conventional clause used by the federal government:

 The Council hereby gives its irrevocable consent to allowing the Authority to sue and be sued in its corporate name, upon any contract, claim or obligation arising out of its activities under this ordinance \* \* \*

Reservation Housing Ordinance 69–2 (April 29, 1969), Art. V, § 2(a).[2] The fact that the Ordinance specifically "authorizes the Authority to agree by contract to waive any immunity from suit *which it might otherwise have* \* \* \*" does not negate the intent of the Ordinance to deny immunity to the corporation. *Id.* (Emphasis supplied.) This clause simply indicates a desire to make the corporation's amenability to suit unqualifiedly clear. The Court finds that one of the purposes of the Ordinance was to cut the corporation off from the protection of sovereign immunity in the same way that Congress has done with federally-created corporations.

Three questions remain:

■■ (1) Did the Reservation Business Committee, as distinguished from the Tribe, have power to create a legally responsible corporation? We think it did. It merely consented to waive the immunity of one corporation—a corporation fully funded by the federal government to build a housing project on a reservation fully controlled by the Reservation Business Committee. The scope of the waiver was thus exceedingly narrow and could not obligate any of the Tribal assets. The Court believes that the power to grant such limited waiver was inherent in the Reservation Business Committee's power to establish a corporation. Moreover, the ordinance establishing the corporation and containing the waiver clause was a form ordinance submitted to the Committee by the Minnesota Chippewa Tribe.

■ (2) Does the Tribe as an entity have power to waive immunity, or must

2. It is not necessary to demonstrate that Congress affirmatively and knowingly intended not to cloak the corporation with immunity. Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 389, 59 S.Ct. 516, 83 L.Ed. 784 (1939). By analogy, therefore, the fact that the Reservation Business Committee did not discuss the sue-and-be-sued clause when it passed the ordinance establishing the Housing Authority is not dispositive of the question of whether or not sovereign attributes were conferred upon the corporation.

a vote of the Tribal members be obtained? It is argued that the waiver power is a "reserved power" held by the members and that a constitutional amendment would be required to grant to the Tribe that power. The Court is not persuaded by this logic. The power to waive the sovereign immunity of the United States is nowhere mentioned in its Constitution, but Congress and the President have been exercising that power from the inception of the republic. The power of the Tribe to waive immunity is no more "reserved" than is the power of the United States to do the same; in both instances, the power to waive immunity is inherent in the power to assert it.

(3) Is a specific act of Congress required to make consent effective? There is explicit dictum to this effect. *See,* United States v. United States Fidelity & Guaranty Co., *supra* at 512–513, 60 S.Ct 653; Cherokee Nation v. State of Oklahoma, 461 F.2d 674, 680–681 (10th Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972); Maryland Casualty Co. v. Citizens National Bank of West Hollywood, 361 F.2d 517 (5th Cir.), cert. denied, 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966); Thebo v. Choctaw Tribe of Indians, *supra* at 375–376. But, in each case, the Court spoke only of suits directly against Indian tribes or Indian nations. Here, the suit is against a different and more circumscribed entity: a corporation created by an Indian reservation to carry out a federal program with federal funds. Moreover, Justice Brandeis' language in *Turner,* which is often cited as the seminal Supreme Court decision on this issue, is more ambiguous:

\* \* \* Without authorization from Congress, the Nation could not have been sued in any court; *at least, without its consent.* \* \* \*

Turner v. United States, *supra* at 358, 39 S.Ct. at 110. (Emphasis supplied.)

One of the leading texts on Indian law contains similar indications that a tribe may unilaterally waive consent:

There remains the question of whether suit may be brought by or against an Indian tribe where Congress is silent.

The latter portion of this question is easier to answer than the former. We have noted that an Indian tribe is a municipality. As such it would appear to be exempt from suit unless it has consented thereto *or* been subjected thereto by a superior power.

Federal Indian Law, 491–492 (1958). (Footnote omitted; emphasis supplied.)

After a discussion of *Thebo's* long dictum on the need for congressional consent, the text goes on to say:

Although a tribe, as a municipality, is not subject to suit without its consent, it may be argued that a tribe has legal capacity to consent to such a suit. The power to consent to such suit must be regarded as cognate with the power to bring suit.

*Id.* at 494.

Judge Nichol, in his opinion in Hickey v. Crow Creek Housing Authority, 379 F.Supp. 1002 (D.S.D., 1974), concludes that a tribe can unilaterally consent to suit only in tribal court, and that that is the meaning of the "sue and be sued" clause in the Ordinance. *Id.,* at 1003. This Court cannot agree, for there is little logic to that proposition and there is no language in the Ordinance limiting the consent to suits in tribal court. It is important to the development of the Indian tribes that they be given a greater control over their own destinies. If they are to be permitted to form corporations to conduct semi-governmental activities, they must of necessity be permitted to waive immunity from suit with respect to those activities. If a tribe can unilaterally consent to suit in a tribal court, there is no reason why it should be incapable of

consent to suit in a federal court. The Court, therefore, concludes that Congress did not need to join in the waiver of the immunity of this one corporation.

▇ Even if it be held that Congress must consent to a waiver of immunity, consent to the limited waiver involved here may be implied from the actions of Congress in establishing a sweeping program to provide low-income housing to needy families, including Indian families. *Cf.*, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, 690–692 (1974) (Marshall, J., concurring) (suggesting a waiver of sovereign immunity by a state by participating in a federally-funded welfare program). Consent to limited suit against a reservation-created housing authority may be inherent in that federal program, in light of the fact that developers and lenders will be reluctant to deal with a corporation which is legally irresponsible and cannot be made to answer for its debts. Counsel for the Housing Authority has pointed to cumbersome alternative procedures for securing financing and development, including a corporation formed by private Indian individuals or escrow accounts. The Court is unable to perceive any significant practical difference between the means employed here and the suggested alternatives. In effect, an escrow account has been established here, with the funds on deposit at the Farmers and Merchants Bank at Cook, Minnesota. The Tribe is exposed to no liability and only the assets for the housing project are vulnerable to suit.

▇ To dismiss this suit against the local Housing Authority on grounds of sovereign immunity would be grossly unfair. The Reservation Business Committee purported to create an independent corporation which would be legally responsible for its promises. It invited outsiders to do business with it on a contractual basis, and the corporation promised the plaintiff over one million dollars in compensation. As was said by another Court in a related context:

\* \* \* [I]t is repugnant to the American theory of sovereignty that an instrumentality of the sovereign shall have all the rights and advantages of a trading corporation, and the ability to sue, and yet be itself immune from suit, and able to contract with others, or to injure others, confident that no redress may be had against it as a matter of right \* \* \*.

Federal Sugar Refining Co. v. United States Sugar Equalization Board, 268 F. 575, 587 (S.D.N.Y.1920).

## MERITS

We turn to the merits of Namekagon's action against the Housing Authority. On June 30, 1971, Namekagon entered into two contracts of sale with the Housing Authority, providing that Namekagon was to construct thirty-six homes, four fourplexes, and one community center on the Bois Forte Reservation, and that the project was to be completed and paid for in phases. The project was to be fully completed in 360 days, and the purchase price for all units was to be $1,021,261.

The project got off to a slow start because Namekagon was unable to secure sufficient interim financing without obtaining from the Housing Authority leases for the land on which some of the homes would be built. Although Namekagon communicated its need for these leases to the Housing Authority and to the Bureau of Indian Affairs on a number of occasions, they were not made available until December, 1971. The officers of Namekagon did obtain some interim financing by pledging their personal assets. The amount received, however, was not sufficient to permit the job to be pursued vigorously. Moreover, during the fall and early winter of 1971, the Housing Authority requested Namekagon to change several sites at Pineview because the Public Health Service had discovered that initially selected sites were too rocky to

permit sewer access. Thus, the first three phases, under which Namekagon was to have delivered five homes in October, 1971, eight more homes in December, 1971, and five more homes in February, 1972, were not met. Nevertheless, by January, 1972, Namekagon had started and partially completed homes on twenty-seven approved sites.

From the outset, the Housing Authority and the Reservation Business Committee (the local governing arm of the Minnesota Chippewa Tribe) insisted that Namekagon employ more residents of the reservation than Namekagon thought feasible.[3] Namekagon did not meet all requests because it had subcontracted out a portion of the work to two subcontractors: CBS Homes, which panelized homes off site, and Ronnenberg, who erected buildings on site. The residents of the reservation objected to the use of CBS Homes because they had believed that the homes would be stick built on the site, a situation which would have provided more local jobs. The residents objected to the Ronnenberg contract because they felt that he did not employ as many reservation resi-

dents as he ought and because they felt that his work was shoddy.

The sale of the first eight homes took place on April 13, 1972. At that time, the Executive Director of the Housing Authority declared that as a condition of any future sale, Namekagon would have to dismiss both CBS Homes and Ronnenberg from the project and would have to employ more resident labor. Namekagon agreed to these conditions with reluctance. It relieved Ronnenberg of his responsibilities under his subcontract, discontinued further purchases of CBS Homes, and authorized the Reservation Business Committee to find others who would perform the work previously done by those two subcontractors. The work on the project was slowed during the search. On June 9, 1972, the Housing Authority ordered that the project be shut down.[4] This order was rescinded three days later,[5] but only after an understanding was reached that Namekagon would award mini-contracts to local residents. The new arrangement did not speed the work significantly. On June 30, the Authority finally authorized Namekagon to award the work included in the cancelled Ronnenberg con-

3. Namekagon had indicated in a letter to HUD on February 2, 1971, that it would affirmatively seek to employ reservation residents:

On this project we will use Indian workmen and subcontractors to the greatest extent possible. We will notify all of our subcontractors of our interest in seeing that they recruit local help to assist in the completion of this project.

4. A letter signed by the Executive Director on that date stated in part:

I have been directed by the * * * Housing Authority to advise you of the action taken by them at a regular meeting held at the Community Hall, June 8, 1972.

The entire meeting was devoted to the proposed take-over of the Ronnenberg contract and it's [sic] innate problems * * *. The members feel that local residents should take the contract and still be paid on.a weekly basis. * * *

The Housing Authority further feels that shutting the project down at this time will not interfere too adversely with progress

inasmuch as the road bans are still on on the reservation part of Highway 23 and should a speedy settlement be effected at a meeting proposed to be held on Monday, next, construction can be continued with a loss of but two days.

In their behalf, then, I hereby direct that all operations cease and desist as of this moment and request that a meeting between your company and reservation officials be set for Monday, June 12, 1972.

5. A letter from the Executive Director stated in part:

So much of my letter dated June 9, 1972 and addressed to you as pertains to stoppage of work on Minn 81–1 & 2 [the contracts] is hereby rescinded.

I am continuing my efforts to effect a meeting of HUD, BIA, RBC, LHA and Namekagon officials to resolve any differences which may still be out standing [sic] and to discuss the awarding and financing of sub and mini contracts awarded or to be awarded to local residents.

tract to a responsible outside contractor, subject to certain conditions.[6]

Despite the delays, twelve additional homes were accepted and purchased by the Housing Authority on September 27, 1972. Thereafter, work continued to progress slowly. On January 17, 1973, the Chief Architect of the HUD area offie called a meeting in Duluth, at which he urged cooperation to complete the project and informed the Housing Authority and Namekagon that HUD would permit no additional units to be started until those under construction were completed. Work continued on the interior of the homes under construction until February 12, 1973.

On February 12, 1973, the Housing Authority wrote to Namekagon a letter purporting to terminate the contracts. The letter stated:

> This letter is to advise you that the Bois Forte Reservation Housing Authority considers Namekagon Development Company, Inc., to have materially breached its contract of sale dated June 30, 1971, by and between the Namekagon Development Company, Inc., and the Bois Forte Reservation Housing Authority. You have failed to meet the schedules of completion called for in said contracts and have virtually ceased to do any work on this project at this time.

> This letter is to advise you that the Bois Forte Reservation Housing Authority will purchase no additional completed improvements from Namekagon Development Company, Inc., and we, therefore, advise you to do no additional work on any units that have not been accepted by the Boise Forte Reservation Housing Authority. We also suggest that you remove all of your equipment and materials and uncompleted improvements from the Reservation within 60 days from the date of this letter.

> We do expect you to correct the deficiencies previously reported to you in the housing units that have been conditionally accepted by the Bois Forte Reservation Housing Authority.

Thereafter, the Housing Authority made it clear to Namekagon that it must leave the reservation, and Namekagon complied.

The Housing Authority subsequently entered into two contracts with Dan J. Brutger, Inc. The first called for the completion of seven homes and two fourplexes partially completed by Namekagon, the construction of nine new homes, and the construction of the community center. The second called for Brutger to complete the punch list items that had not been completed by that date by Namekagon. The sums allowed for completion and new construction were substantially in excess of those allowed to Namekagon under the original contract. (As an example, the price of the new homes constructed by Brutger exceeded those constructed by Namekagon by more than $8,000 per home.) No new funds were authorized by HUD to carry out the Brutger contract. The money for that purpose came from funds retained by the Housing Authority from the Namekagon contract and from the deletion from the project of two fourplexes for the elderly.

6. In a letter from the Executive Director, the Housing Authority stated:

This letter will clarify and confirm the matter of the "Ronnenberg" contract as regards the Local Housing Authority.

We note your willingness to award the contract locally and that no local residents have accepted it. Therefore, there is no valid reason why the contract can not be awarded to a responsible outside contractor at your discretion.

Further, any outside contractor who accepts this can bring his own crew, however, we reserve the right to furnish an equal number of local craftsmen, in accordance with our recent verbal agreement.

I am looking forward to speedy commencement of construction sctivity, [sic]

By this time, however, Namekagon had decided that it would not be able to locate another subcontractor, and that it would have to do the work itself.

Namekagon brought this action against the Housing Authority and the other defendants, demanding that it be paid in full for uncompensated costs incurred in the performance of the contract. The Housing Authority refused payment, contending that it was justified in cancelling the contract and in not paying Namekagon for the work that had been performed for the reasons stated in its letter of February 12, 1973.[7]

■ After carefully reviewing the evidence, the Court finds that the Housing Authority was not justified in cancelling the Namekagon contracts. The reasons given for the cancellation were that Namekagon had virtually ceased construction during the period immediately preceding February 12, and that Namekagon had wrongfully failed to meet construction deadlines.

Daily reports sent by the Executive Director of the Housing Authority to HUD and testimony adduced at trial effectively refute any claim that Namekagon had virtually ceased work on the job during the first two weeks of February.

There were extensive delays on the job, but many of them were attributable to the Housing Authority. The Court finds that it delayed the project:

(1) By failing to provide the needed leases to Namekagon. This failure pushed much of the outside work that was scheduled to be done during the summer and fall of 1971 into the winter of 1971–1972.

(2) By insisting on the termination of the Ronnenberg and CBS contracts, as detailed above.

(3) By not securing prompt changes in site locations at Pineview.

(4) By failing to secure electrical power at the site at the earliest possible date.

(5) By failing to secure proper coordination and cooperation between the Housing Authority and other governmental and Tribal agencies involved in the project. These included the Department of Housing and Urban Development, the Bureau of Indian Affairs, the Public Health Service and the Reservation Business Committee.

■ This is not to say that all of the delays were caused by the Housing Authority. Namekagon was also responsible for some of the delays. Its failure to adequately supervise and coordinate the work added to the length of time that it took to perform the project. It cannot expect to be compensated for damages flowing from those delays. But in light of all the circumstances, the Court finds that two-thirds of the delays were attributable to the Housing Authority, and that the delays attributable to Namekagon were not sufficient to justify the Housing Authority in cancelling its contracts with Namekagon. It follows that Namekagon is entitled to recover those damages which flow from the Housing Authority's wrongful termination of the contracts.

## DAMAGES

■ Namekagon contended in closing argument that the proper measure of damages is the difference between its total costs ($886,203) and the amount that it has paid to date ($373,855), less the cost of repairing punch list items not repaired by it ($21,000); a net of $491,348.

The Authority contended in closing argument that Namekagon is not entitled to any damages because the Authority's costs to complete the project and to repair punch list items not repaired by Namekagon will exhaust the funds provided by the United States to the Authority even though two fourplexes for

7. At trial, the Housing Authority introduced evidence tending to show that the contract was cancelled for the further reason that the workmanship of Namekagon and of its subcontractors was of inferior quality. The Court specifically finds: (1) that the workmanship was not of a quality justifying cancellation; and (2) that whatever defects there may have been in the workmanship were waived by the Housing Authority, at least with respect to the twenty homes that were accepted subject to a punch list.

the elderly and other items have been deleted from the project.

The Court rejects both points of view —Namekagon's because some of the costs incurred by it are not properly chargeable to the Authority, and the Authority's because it wrongfully delayed construction, thus increasing construction costs, wrongfully terminated its contract and wrongfully failed to pay Namekagon for work accomplished by Namekagon in accordance with the contract.

 The Court will allow Namekagon to recover those damages which will place Namekagon in substantially the position it would have been in had it not been for the Authority's wrongful acts.

Architectural Services ................$20,705

These services were fully performed by Namekagon before the contract was cancelled. The plans and specifications were used by Brutger (the succeeding contractor) without change. The sum allowed is that estimated by Namekagon before it commenced the job, less amounts received by it.

Roads ..............................$11,714

All roads were completed by Namekagon before its contract was cancelled. The sum shown represents the difference between the sum allocated for roads in Namekagon's bid and the amount paid to it by the Authority.

Approved Change Orders ...............$ 5,778

The work on these approved change orders was performed by Namekagon prior to termination, but no payment was made to it.

Materials Stored on Site at Termination ...$25,100

These materials were used by Brutger to continue construction after Namekagon's contract was terminated. The Authority does not contest Namekagon's valuation of the materials.

Seven Incomplete Homes ...............$78,075

Costs incurred on seven partially completed units prior to termination ($87,615) for which no payments were made, less costs of repairing punch list items on said buildings ($9,540). Costs incurred are based on costs as bid and the percentage of completion at date of termination:

 6 Units—80% complete
 1 Unit —60% complete

The inspecting architect employed by the Authority concurred in percentage of completion figures. The Court finds these estimates to be reliable.

*The costs would be higher if Brutger's testimony were accepted.* He testified that the value of each completed three-bedroom home was $27,100 and each four-bedroom home, $28,819, and the units were 65% complete when he took over. On this basis, the value of the partially completed homes was $106,990, even after allowing a 1% per month inflation factor.

Two Incomplete Fourplexes ..............$47,134

Costs incurred on two partially completed elderly units ($50,200), less cost of repairing punch list items ($3,066). Costs based on 80% completion on costs as bid.

The Brutger value would be $66,668, using the same assumptions as used for the seven partially completed units.

One Foundation ......................$ 1,100

*50% of the value of a completed foundation as per testimony of Namekagon and Brutger.* This foundation was used by Brutger in completing one unit.

One Footing ..........................$ 600

Namekagon's cost as bid. Not used by Brutger because it deteriorated between date it was constructed and date Brutger started on the job. Namekagon was not responsible for deterioration.

Sewers and Driveways ..................$ 2,995

Cost of constructing sewers and one-half cost of constructing driveways built by Namekagon. Costs are based on costs as bid.

Punch List Items .....................$40,129

Amount withheld on the sale of twenty *completed homes ($68,145), less the* amount expended by Brutger to date, including profit, in repairing punch list items and visible damage ($28,016).

The Housing Authority may make application for modification of this sum to reflect the cost of repairing punch list items not previously repaired pursuant to Defendants' Exhibit No. 36. In no event will the adjustment exceed $14,771, it being specifically found that Brutger has received an overpayment for punch list items on these homes in the sum of $22,949 and *is obligated to make repairs to that sum* or give a credit for work not performed. No modification will be permitted more than thirty (30) days after issuance of this order.

Pineview Site Change ..................$13,850

The work performed pursuant to this change was necessary, was not included in the original bid price and was not such as to have been reasonably contemplated by Namekagon.

Delay Costs ..........................$26,355

The Court finds that the average delay per unit was approximately seven months, and that two-thirds of that delay, or 4.7

months per unit, was attributable to the Housing Authority. The delay costs attributable to the Housing Authority are comprised of the following:

Additional Labor
and Material ...............$7,131

The Court finds that the delays occurred during calendar years 1971 and 1972. The Court further finds that the cost of labor and materials during this period increased at the rate of ½% per month. The Court finds that the cost, as bid by Namekagon, of the work that it completed was as follows:

Sales to date
 (20 homes) ......$442,000
Six homes, 80%
 complete .......$128,000
One home, 60%
 complete .......$ 13,200
Two fourplexes,
 80% complete ....$ 70,400
One foundation .....$ 1,100
One footing ........$ 600
 $655,000

The Court finds that 65% of Namekagon's original bid was for labor and materials on site. Applying these figures, the additional cost to Namekagon for labor and materials attributable to the defendant is $7,131, computed as follows:

$655,000 (total bid costs for work completed by Namekagon) X 65% = $425,750 (portion attributable to labor and materials).

½% (monthly inflation rate) X 4.7 (months delayed due to fault of Housing Authority) X ½ (averaging factor) = 1.675% (actual inflation suffered by Namekagon and chargeable to Housing Authority).

$425,750 X 1.675% = $7,131.

Additional Supervisor's Wages ..$ 9,250
(4.7 months)

Additional Interest Costs .....$ 6,823
(4.7 months)

Additional Overhead at Site ...$ 3,150
(4.7 months)
 $26,355

The Court disallows damages for the following items because it finds that Namekagon has failed to sustain the burden of proving that the costs incurred were attributable to wrongful acts of the Housing Authority: forms for nine foundations; interim financing; labor and materials for garages; demolition expenses; culverts; top soil at the Vermillion site; expenses for foreman removed from the job; and labor to repaint Vermillion homes.

The Court disallows a claim by Namekagon in the sum of $2,450 for the installation of sewage ejectors. The Court believes that a careful investigation of the site by Namekagon would have alerted them to the fact that sewage ejectors would be required in the units in question.

The Court disallows a claim of $11,776 representing additional labor costs incurred by Namekagon in being required to pay carpenters in excess of the amount set forth in the wage scale attached to the contract documents. The Court finds that Namekagon ought reasonably have been put on notice that the wage rate of $4.74 specified for carpenters was not correct. It ought to have insisted on this matter being clarified before it proceeded with the work. The inquiries that it did make were not, in the view of the Court, sufficient to justify proceeding on the assumption that carpenters would be paid almost $1.00 an hour less than laborers.

The Court disallows a claim for $58,109 for allegedly nonproductive and unqualified labor. It may be conceded that the contractor spent considerably more than $58,000 for labor in addition to the sum allocated in its bid for that purpose, but we are persuaded that only a small percentage of that amount was incurred because of the wrongful acts of the Housing Authority. The Court finds that the additional cost of labor over and above the modest sum allowed by the Court (a part of the $7,131) was caused by: (1) an under-estimation by Namekagon of labor costs at the time the bid was submitted; (2) Namekagon's inadequate supervision and coordination of the work force; and (3) Namekagon's acceptance of a demand on the part of the Executive Director of the Housing Authority that more reservation labor be used on the job than the

contract required. While the decision to accept or reject this demand was a difficult one under the circumstances, it cannot serve as the basis of an award of further damages to Namekagon.

This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law. The Clerk is instructed to enter judgment in favor of the plaintiff and against the defendant, Bois Forte Reservation Housing Authority, in the sum of $273,535, and to enter a permanent injunction pursuant to the Court's order of October 4, 1974.

The Order for Permanent Injunction, dated October 4, 1974, is made a part of this Court's findings of fact and conclusions of law.

Let judgment be entered accordingly.