KENNETH J. BUKOWSKI, Corporation Counsel Brown County
On behalf of Brown County and the Green Bay Metropolitan Sewerage District (METRO) you have asked several questions concerning METRO's jurisdiction within the Oneida Reservation. Recently, the Town of Hobart, which is entirely within Brown County, filed a petition requesting annexation to METRO of all that part of the township not previously within METRO. Within the boundaries of that part of the Town of Hobart seeking annexation is territory identified as heirship land, tribal trust land and individual trust land, all of which is held in trust by the United States of America for either the Oneida Tribe or individual members of the Oneida Tribe. Reference to trust land in this opinion includes these various land tenure classifications. Part of the territory identified in the annexation petition, including both fee and trust land, lies within the original boundaries of the Oneida Reservation as established by the treaty with the Oneida, February 3, 1838,7 Stat. 566.
METRO granted the Town of Hobart's annexation petition but expressly excluded the Oneida trust lands on the basis that:
 1. The very existence and/or boundaries of the "reservation" is being litigated in Federal Court.
 2. The Oneida Tribe of Wisconsin possesses certain attributes of sovereignty.
 3. The Oneida Tribe of Wisconsin has retained certain powers of self government which include the authority to regulate or control certain aspects of the use or development of trust lands.
 4. The Oneida Tribe of Wisconsin may not have the authority to voluntarily subject itself to the jurisdiction of METRO even if it had elected to do so, which it did not. *Page 190 
Based on these concerns and your interest in finding an effective way to provide adequate sewage treatment to the Oneida Indians, you ask the following questions:
 1. Is the Oneida Tribe of Wisconsin a "municipality" within the meaning of Sections 66.20 to 66.26? (For example, and without limitation, 66.4(3) and (6).)
 2. Is the Oneida Tribe of Wisconsin a "municipality" within the meaning of Section 66.30 of the Wisconsin Statutes for any purpose other than "the establishment of a joint transit commission."
 3. Mindful of its authorization "to contract and to be contracted with" in Section 66.24(1) does METRO have authority to enter into contracts with the Oneida Tribe of Indians of Wisconsin to provide sewerage service to lands held in trust by the United States of America either for the Oneida Tribe of Wisconsin or its individual tribal members? If not, what statutory amendments do you suggest to provide METRO with that contracting authority?
 4. Does the Oneida Tribe of Wisconsin have the authority to enter into an enforceable agreement with METRO? If not, what statutory amendments or other action do you suggest to provide the Oneida Tribe of Wisconsin with that statutory authority?
 5. Is it necessary for the Oneida Tribe of Wisconsin to waive whatever sovereign immunity it may have for the agreement to be enforceable, and if it is, does the Oneida Tribe have the authority to do so?
 6. If the Oneida Tribe of Wisconsin does have authority to enter into an enforceable agreement with METRO, with or without the prerequisite of an enforceable waiver of sovereign immunity:
 (a) In what jurisdiction would the agreement be enforceable?
 (b) Would the agreement with the tribe be enforceable as to its individual tribal members?
 (c) Must the United States as trustee of the lands serviced by METRO be a party to the agreement?
 (d) Does the agreement need Secretarial approval as set forth in Title 25, Section 81 of the United States Code? *Page 191 
 (e) May METRO enforce its sewer use ordinances and other ordinances which provide:
1. Entry upon the land by METRO personnel.
2. Monitoring and inspection of discharges.
3. Compliance enforcement activities.
 4. Holding of hearings and imposition of punishment.
 5. METRO use of Section 823.02 of the Wisconsin Statutes including collection of user fees and payment for services.
 6. METRO issuance of pretreatment orders as deemed appropriate.
 7. Billing procedures and collection of charges for sewer treatment and other services.
(Emphasis added.)
Before considering your specific questions, a few preliminary issues need to be addressed.
You indicate that the status of the Oneida Reservation is at issue in litigation. I understand that the focus of that litigation is on whether the original Oneida Reservation has been diminished to where it now consists only of trust lands scattered throughout the Oneida Tribe's original territory as defined in the 1838 Treaty. AS you may know, it is the policy of this office not to comment on issues in litigation. Since your concern is over METRO's jurisdiction only on trust land regardless of how the reservation is defined, rather than the matters at issue in the litigation, and since the issues you raise are only indirectly involved in that litigation, the no-comment policy is not applicable. It is assumed for purposes of this opinion that all the trust land in question lies within the original boundaries as defined in the 1838 Treaty. Also, it is assumed that at minimum the trust land constitutes the Oneida Reservation.
Recent case law has identified the criteria for determining whether a state has regulatory jurisdiction within reservation boundaries. In County of Vilas v. Chapman, 122 Wis.2d 211,361 N.W.2d 699 (1985), the court summarized the analysis which must be used to resolve jurisdictional disputes:
 In Webster [State v. Webster, 114 Wis.2d 418, 338 N.W.2d 474 (1983)] we discussed in some detail the analytical framework the *Page 192 
United States Supreme Court has developed to determine whether states have jurisdiction over Indian country. We noted that the Supreme Court has rejected the view that the states are absolutely barred from exercising jurisdiction over tribal reservations and members. However, two barriers remain to the state's exercise of jurisdiction. First, the exercise of such authority may be preempted by federal law. Second, state jurisdiction may infringe upon the right of Indians to establish and maintain tribal self-government. Id. at 432. The Supreme Court has stated that "[t]he two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980).
Id. at 214.
In Rice v. Rehner, 463 U.S. 713, 719 (1983), the Court further clarified the relationship between the infringement and preemption inquiries where state regulatory jurisdiction within an Indian reservation is at issue, stating:
 The role of tribal sovereignty in preemption analysis varies in accordance with the particular "notions of sovereignty that have developed from historical traditions of tribal independence . . . ." When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect. "`Except when Congress has expressly provided that state laws shall apply.'" . . . If, however, we do not find such a tradition, or if we determine that the balance of state, federal and tribal interests so requires, our preemption analysis may accord less weight to the "backdrop" of tribal sovereignty.
Unquestionably, the Oneida Tribe's governmental status is relevant to any analysis of METRO's jurisdiction over Oneida Reservation lands. Within reservation boundaries, there can be overlapping jurisdiction between tribal government, state government (including its political subdivisions) and the federal government. It is settled that the Oneida Tribe, like other federally-recognized Indian tribes, retains attributes of sovereignty over both its members and its territory. See Merrionv. Jicarilla Apache Tribe, *Page 193 455 U.S. 130 (1982); Montana v. United States, 450 U.S. 544, 563
(1981); United States v. Mazurie, 419 U.S. 544, 557 (1975). Environmental concerns are a legitimate attribute of tribal sovereignty. A federally-recognized tribes' territorial sovereignty has been held to include, in many cases, all land within its reservation boundaries. Id. See also Buster v. Wright, 135 F. Rptr. 947 (8th Cir. 1905), appeal dismissed, 203 U.S. 599
(1906) and United States v. Wheeler, 435 U.S. 313 (1978); 71 Op. Att'y Gen. 191 (1982) (concurrent jurisdiction between tribe and state to zone private property within reservation boundaries); 75 Op. Att'y Gen. 123 (1986) and 76 Op. Att'y Gen. 80 (1987) (concurrent state and tribal jurisdiction over liquor within reservation boundaries).
The tribe's interests in providing waste disposal facilities to Indians on trust land within the reservation are those of public health and safety, including the protection of the reservation environment from any pollution that may occur. These interests parallel the state's interests in public health and safety for all citizens, with the protection of the environment from transboundary pollution included.
The federal government has an interest in providing waste disposal facilities to tribes. It is expressed in the Indian Health Care Improvement Act of 1976 (18 U.S.C. § 1601-1680 (1985)), which provides in relevant part:
 [F]ederal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resettling responsibility to, the American Indian People.
18 U.S.C. § 1601(a) (1985).
Also, the act provides that further improvement in Indian health is imperiled by "a lack of safe water and sanitary disposal services" (§ 1601(f)(6)) and provides for appropriations "to supply unmet needs for safe water and sanitary waste disposal facilities in existing and new Indian homes and communities." 18 U.S.C. § 1632(a). Historically, such services have been provided by the federal government, first by the Bureau of Indian Affairs in the 1850's, and more recently by the Indian Health Service. See 1976 U.S. Code Cong. Admin. News., p. 2652. *Page 194 
The federal interests are further implicated by the federal government's policy of encouraging tribal self-government.[1]
This policy has recently been expressed and re-emphasized in the area of environmental programs through the creation of the Environmental Protection Agency's Indian policy which provides that the "EPA recognizes tribal governments as sovereign entities with primary authority and responsibility for the reservation populace. Accordingly, EPA will work directly with tribal governments as the independent authority for reservation affairs and not as political subdivisions of states or other governmental units." Office of the Administrator, United States Environmental Protection Agency; Indian Policy Implementation Guide (November 8, 1984). The most recent expression of the policy of encouraging tribal self-government is indicated by the Indian Alcohol and Substance Prevention and Treatment Act of 1986. 25 U.S.C. § 2411
(Supp. 1987).
The backdrop of Indian sovereignty (in this analysis) is particularly significant, both because of the territorial aspect of the Oneida Tribe's sovereignty and because "the sovereign role of the tribes . . . does not disappear when the federal government takes responsibility for the management of federal program(s) on tribal lands." State of Wash., Dept. of Ecology v.U.S.E.P.A., 752 F.2d 1465, 1471 (9th Cir. 1985).
In evaluating the federal, state and tribal interests in providing sewage treatment facilities to Indians on the Oneida Reservation one finds that the Oneida Tribe's interests in protecting the reservation environment and tribal self-government are enhanced by the federal government's interest in providing these services and its policy of strengthening tribal self-government. Taken together, these interests outweigh the state's interest in regulating waste disposal on the reservation.
This analysis, though not directly applicable to your first two questions, is relevant to your other questions concerning contracting with the Oneida Tribe to provide adequate sewerage disposal to the trust lands in question. Because METRO cannot exercise regulatory jurisdiction over trust lands within its district, *Page 195 
contracting with the tribe appears to be the most viable method to make available such services on these lands.
Against this background, each of your questions will now be considered.
 1. Is the Oneida Tribe of Wisconsin a "municipality" within the meaning of Sections 66.20 to 66.26? (For example, and without limitation, 66.24(3) and (6).)
State statutes empower a multiplicity of units of local government to construct, operate and maintain sewerage treatment systems. Such treatment districts, which are themselves special units of local government, are formed either as a metropolitan sewerage district or a joint sewerage district. Secs. 66.20 and 144.07, Stats. The organization and powers of a metropolitan sewerage district are for the most part set forth in sections 66.22 through 66.26. The procedures for creating a district are set forth in section 66.22. Subsection I provides in relevant part: "Proceedings to create a district may be initiated by resolution of the governing body of any municipality . . . ." Municipality is defined as any town, village, city or county. Sec. 66.20(4), Stats. Clearly, a tribal government is not a municipality as that term is defined in these statutory provisions. The context within which municipality is used requires that the governmental unit be a political subdivision of the state. The Oneida Tribe's governmental status is not affected or determined by state law.
The governmental status of the Oneida Tribe was discussed in detail in 72 Op. Att'y Gen. 132 (1983). There, it was concluded that section 144.07(4)(a) does not authorize joint sewerage commissions to include tribal governments as member governmental units. In that opinion at 133-34, it is stated:
 To operate effectively a joint commission must have sufficient authority over its member governmental units to enable it to carry out its various responsibilities set forth in chapter 144. Because of the special governmental status of Indian Tribes and the unique jurisdictional relationship they have with the state, it is unlikely the commission would have sufficient authority over a tribal government member to carry out commission activities as anticipated by chapter 144.
. . . . *Page 196 
 Because of the uncertainty regarding the jurisdictional relationship between Indian Tribes and the state over environmental matters generally, . . . it is my opinion that the Legislature simply did not have tribal governments in mind when it authorized governmental units to form joint sewerage commissions. Where the Legislature has recognized tribal government as of the same status as local units of government, it has done so explicitly.
Id. at 133-34 (citations omitted).
That analysis is equally applicable to metropolitan sewerage districts. It, therefore, is my opinion that the Oneida tribal government is not a municipality within the meaning of section 66.20(4).
 2. Is the Oneida Tribe of Wisconsin a "municipality" within the meaning of Section 66.30 of the Wisconsin Statutes for any purpose other than "the establishment of a joint transit commission."
The express mention of "federally recognized Indian tribe or band" in section 66.30(1)(b) and its visible absence in section 66.30(1)(a) is strong evidence of legislative intent to not include tribal governments as municipalities for any other purpose. If the Legislature had wanted to include tribes for any other purpose it would have done so when it originally included tribes in section 66.30(1)(b). The above-stated analysis for exclusion of Indian tribal governments in section 144.07(4)(a) is also applicable here.
 3. Mindful of its authorization "to contract and to be contracted with" in Section 66.24(1) does METRO have authority to enter into contracts with the Oneida Tribe of Indians of Wisconsin to provide sewerage service to lands held in trust by the United States of America either for the Oneida Tribe of Wisconsin or its individual tribal members? If not, what statutory amendments do you suggest to provide METRO with that contracting authority?
Within the general constraints of the laws of contract and to the extent that such constraints limit the authority of a municipal body corporate, it is my opinion that METRO does have the authority to enter into a contract with the Oneida Tribe to provide sewerage service to any lands within the exclusive jurisdiction of the tribe. Since METRO excluded trust lands from the territory identified in the Town of Hobart's annexation petition, such lands are outside *Page 197 
the territorial jurisdiction of METRO. A similar situation involving the authority of a joint sewerage commission to contract to provide service outside its territorial jurisdiction was addressed in 68 Op. Att'y Gen. 83 (1979). Relying on Villageof Butler v. Renner Mfg. Co., 70 Wis.2d 1, 233 N.W.2d 380
(1975), the opinion concludes that a joint sewerage commission can contract to receive and treat discharges from a facility outside its legal jurisdiction. I have found no legal basis to distinguish between the contractual authority of a joint sewerage commission in this regard and a metropolitan sewerage district.
Your remaining questions focus on the authority of the Oneida Tribe of Wisconsin to enter into a contractual relationship with METRO for sewerage service. My response to your specific questions concerning the Oneida Tribe's authority to contract with METRO only reflects those legal principles that are applied generally to contractual relations with Indian tribes.
You ask:
 4. Does the Oneida Tribe of Wisconsin have the authority to enter into an enforceable agreement with METRO? If not, what statutory amendments or other action do you suggest to provide the Oneida Tribe of Wisconsin with that statutory authority?
The Oneida Tribe is organized under the Indian Reorganization Act of June 18, 1934 (48 Stat. 984, 25 U.S.C. § 461-478 (1983)), and has adopted a constitution and bylaws pursuant thereto which set forth the basic organization for the exercise of tribal governmental power (25 U.S.C. § 476 (1983)). Also, pursuant to the Act, the tribe secured a corporate charter from the federal government for the purpose of engaging in business activities (25 U.S.C. § 477 (1983)). Both the corporate charter and the constitution and bylaws were approved by the Secretary of the Interior. Under the Act, both the tribal government and the tribal corporation are authorized to enter into contracts. Merrion v. Jicarilla Apache Tribe, 455 U.S. 130,134, 147 (1982); Montana v. United States, 450 U.S. 544, 565
(1981); Blackfeet Tribe of Blackfeet Indian v. Wippert,442 F. Supp. 65, 66 (1977).
Certain contracts with Indian tribes or individual tribe members are subject to the provisions of 25 U.S.C. § 81
(1983). That statute provides in relevant part: *Page 198 
 No agreement shall be made . . . with any tribe of Indians, or individual Indians . . . in consideration of services for said Indians relative to their lands . . . unless such contract or agreement be executed and approved as follows: . . .
. . . .
 2. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs endorsed upon it.
Pursuant to this statutory language, any agreement with the Oneida Tribe or individual tribe members that would affect trust land would be void unless it is approved by the Secretary of the Interior. A.K Management Co. v. San Manuel Band of MissionIndians, 789 F.2d 785 (9th Cir. 1986); United States ex rel.Shakopee v. Pan American Management Company, 616 F. Supp. 1200
(D. Minn. 1985), appeal dismissed 789 F.2d 632 (8th Cir. 1986).Wisconsin Winnebago Business Committee v. Koberstein, 762 F.2d 613
(7th Cir. 1985). As an agreement between METRO and the Oneida Tribe would likely implicate trust lands,[2] such an agreement would require secretarial approval.
Also under 25 U.S.C. § 2004a (1983), the Secretary of Health and Human Services is authorized to acquire land and make agreements to enable the department to provide essential sanitation facilities to Indian homes and communities. Presumably, the Oneida Tribe in cooperation with the Department of Health and Human Services would be contracting with METRO under the auspices of this statute. Under this statute the federal government would be a party to the contract. If the federal government is involved questions of enforceability are resolved. 28 U.S.C. § 1491 (1983); United States v. Testan,424 U.S. 392 (1976).
Whether the Oneida Tribe has authority under its organic laws to enter into any contract is a question in the first instance that must be answered by the tribe.
 5. Is it necessary for the Oneida Tribe of Wisconsin to waive whatever sovereign immunity it may have for the agreement to *Page 199 
be enforceable, and if it is, does the Oneida Tribe have the authority to do so?
The enforceability of an agreement between METRO and the Oneida Tribe will depend in large part upon the terms of that agreement. In numerous decisions, both in the federal and state courts, it has been held that Indian tribes enjoy sovereign immunity from suits similar to that of the United States. See, e.g., SantaClara Pueblo v. Martinez, 436 U.S. 49 (1978); Puyallup Tribe,Inc. v. Department of Game, 433 U.S. 165 (1977); United States v.United States Fidelity and G. Co., 309 U.S. 506 (1940); U.S. v.Oregon, 657 F.2d 1009, 1012 (9th Cir. 1981); Maryland CasualtyCo. v. Citizens Nat. Bank of West Hollywood, 361 F.2d 517, 520
(5th Cir. 1966); State v. Peterson, 98 Wis.2d 487, 492,297 N.W.2d 52 (Ct.App. 1980). It is unsettled whether an Indian tribe on its own may waive its sovereign immunity to suit, though it has been allowed. Big Spring v. U.S. Bureau of Indian Affairs,767 F.2d 614 (9th Cir. 1985); Merrion v. Jicarilla Apache Tribe,617 F.2d 537 (10th Cir. 1980), aff'd on other grounds 455 U.S. 130
(1982); Native Village of Gyak v. GC Contractors, 658 P.2d 756
(Alaska 1983); U.S. v. Oregon, 657 F.2d 1009 (9th Cir. 1981);Namekagon Dev. Co. v. Bois Forte Res. Housing Authority,395 F. Supp. 23 (D. Minn. 1974), aff'd, 517 F.2d 568 (8th Cir. 1975). A tribe cannot waive its immunity by contract in matters affecting trust property without secretarial or congressional consent.25 U.S.C. § 81 (1983). It is unsettled whether tribes may waive their immunity without congressional authorization in contracts not related to trust property. The Oneida Tribe may have inherent authority to waive its immunity to suit in its own courts, at least where trust property is not affected. However, any waiver of immunity by the tribe must be express, as "[i]t is settled that a waiver of sovereign immunity `cannot be implied but must be unequivocally expressed.'" Santa Clara Pueblo v. Martinez,436 U.S. 49 (1978), quoting United States v. Testan, 424 U.S. 392
(1976). See also State of Wisconsin v. Baker, 698 F.2d 1323, 1331
(7th Cir. 1983).
Most tribal immunity cases since 1934 center on the provisions of the Indian Reorganization Act. Some courts have held that tribes entering into business contracts through the tribal corporation can waive immunity to suit. See, e.g., Maryland Cas.Co. v. Citizens Nat. Bank of West Hollywood, 361 F.2d 517 (5th Cir. *Page 200 
1966), cert. denied, 385 U.S. 918 (1966); Parker Drilling Co. v.Metlakatla Indian Community, 451 F. Supp. 1127 (1978).
Clearly, the tribe's sovereign immunity will affect in some circumstances the enforceability of an agreement between METRO and the tribe. It is beyond the scope of this opinion to discuss options or contract language that may be available to overcome any sovereign immunity problem that may exist. Agreements between METRO and the Oneida Tribe in its non-governmental capacity (i.e., business capacity) that do not implicate trust lands could be one way to overcome most, if not all, of the enforceability problems relating to tribal sovereign immunity. Perhaps this would be useful where services to tribal businesses are contemplated.
 6. If the Oneida Tribe of Wisconsin does have authority to enter into an enforceable agreement with METRO, with or without the prerequisite of an enforceable waiver of sovereign immunity:
 (a) In what jurisdiction would the agreement be enforceable?
It is unclear as to what jurisdiction the agreement would be enforceable in. It no doubt would be in the interest of the parties to address in the agreement any uncertainty concerning choice of laws or judicial forums for resolving disputes. In designating in the agreement the jurisdiction(s) where disputes concerning the terms of the agreement would be enforceable, consideration will need to be given to the fact that in sections 66.20-26 references are made to resolving disputes in state circuit court pursuant to chapter 227.
 (b) Would the agreement with the tribe be enforceable as to its individual tribal members?
Whether individual tribe members residing on heirship land or trust allotments would be bound by the terms of the agreement between METRO and the tribe is unclear. As already indicated, the Oneida Tribe possesses governmental authority over both its members and its territory. Tribal governmental authority has been specifically upheld in such areas as the regulation of tribal hunting and fishing activities (Settler v. Lameer, 507 F.2d 231
(9th Cir. 1974)), domestic relations (United States v. Quiver,241 U.S. 602 (1912); Fisher v. District Court, 424 U.S. 382
(1976)), zoning (Knight v. Shoshone Arapahoe Indian Tribes, etal., 670 F.2d 900 (10th Cir. 1982); see also 71 Op. Att'y Gen. 191, 192 (1982)), tribal membership (Santa Clara Pueblo v.Martinez, 436 U.S. 49 (1978)); property transactions (Crabtree v.Madden, 54 F. Rptr. 426 (8th Cir. 1893)), *Page 201 
power to license and tax property and commercial activity (Morrisv. Hitchcock, 194 U.S. 384 (1904); Buster v. Wright, 135 F. SUPP. 947 (8th Cir. 1905), appeal dismissed 203 U.S. 599 (1906);Washington v. Confederated Tribes of Colville Indian Reservation,447 U.S. 134 (1980)). As already indicated, tribal power to zone trust lands within reservation boundaries was noted in 71 Op. Att'y Gen. 191 (1982).
Provided the tribe's actions relating to individual members' rights comply with the Indian Civil Rights Act, 25 U.S.C. § 1302
(1983), it would appear that individual members would be bound by the exercise of tribal governmental authority in this regard.
 (c) Must the United States as trustee of the lands serviced by METRO be a party to the agreement?
In almost all cases, yes. See discussion following question number 4.
 (d) Does the agreement need Secretarial approval as set forth in Title 25, Section 81 of the United States Code?
 See discussion following question number 4.
 (e) May METRO enforce its sewer use ordinances and other ordinances which provide:
1. Entry upon the land by METRO personnel.
2. Monitoring and inspection of discharges.
3. Compliance enforcement activities.
4. Holding of hearings and imposition of punishment.
 5. METRO use of Section 823.02 of the Wisconsin Statutes including collection of user fees and payment for services.
 6. METRO issuance of pretreatment orders as deemed appropriate.
 7. Billing procedures and collection of charges for sewer treatment and other services.
The enforceability of METRO's sewer use ordinances and any other ordinances which you list will depend on whether they are incorporated within the terms of the agreement. To the extent that an ordinance affects the interest in trust lands, the enforceability would depend upon federal government approval as already indicated. *Page 202 
Approval of such agreements by the federal government would likely resolve any enforcement concerns associated with sovereign immunity.
DJH:JDN
[1] See for example: Indian Reorganization Act of 1934, §§ 1-19, 25 U.S.C. §§ 461-79 (1983); Indian Financing Act of 1974,25 U.S.C. § 1451 et seq. (1983); Indian Self Determination Act of 1975, § 2, 25 U.S.C. § 450 (1983), Indian Tribal Government Tax Status Act of 1982, § 203, I.R.C. § 7701 (a)(40) (1980 and Supp. 1, 1983), Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-08 (1983).
[2] Section 66.24(4) gives the Metropolitan Sewerage District Commission the power to acquire land or property needed for its operations or easements or rights upon such land or property. In addition, section 66.25(1) allows the commission to make a special assessment against property which is served by the sewerage system. Both sections would affect trust lands. *Page 203